Filed 9/2/22  P. v. Cole CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C090105 |
| Plaintiff and Respondent, | (Super. Ct. No. 62159526) |
| v. | |
| ROBERT EUGENE COLE, | |
| Defendant and Appellant. | |

A jury found defendant Robert Eugene Cole guilty of committing numerous sex offenses against three male relatives, including sodomy with a child 10 years of age or younger by a person 18 years of age or older (Pen. Code, § 288.7, subd. (a)),[1] oral copulation with a child 10 years of age or younger (§ 288.7, subd. (b)), two counts of a lewd and lascivious act upon a child under the age of 14 years (§ 288, subd. (a)), forcible

---

[1] Undesignated statutory references are to the Penal Code.

oral copulation (former § 288a, subd. (c)(2)(A) [now § 287, subd. (c)(2)(A)]), oral copulation of an unconscious person (former § 288a, subd. (f) [now § 287, subd. (f)]), oral copulation of a person under 16 years of age by a person over 21 years of age (former § 288a, subd. (b)(2) [now § 287, subd. (b)(2)]), attempted sodomy of a person under 16 years of age by a person over 21 years of age (§§ 664, 286, subd. (b)(2)), and attempted oral copulation of a person under 16 years of age by a person over 21 years of age (§ 664; former § 288a, subd. (b)(2) [now § 287, subd. (b)(2)]).[2] The jury also found true the multiple victim enhancement allegations under the one strike law. (§ 667.61, subds. (b), (e)(4).) The trial court sentenced defendant to an aggregate term of 93 years eight months to life in prison.

Defendant timely appealed on July 31, 2019; after multiple extensions of time for record preparation, correction, and augmentation as well as extensions for the parties' oversized briefing, the case was fully briefed on February 25, 2022, and assigned to this panel on March 30, 2022.

Defendant argues that reversal is required for many reasons, including insufficient evidence, evidentiary error, prosecutorial misconduct, instructional error, ineffective assistance of counsel, and sentencing error. We will modify the judgment to correct a minor sentencing error and affirm the judgment as modified.

## BACKGROUND

We do not attempt to recite all the evidence adduced at trial. Nor do we attempt to resolve the inconsistencies and conflicts in the evidence. Instead, we summarize the relevant facts in the light most favorable to the judgment (*People v. Maury* (2003)

---

[2] Effective January 1, 2019, section 288a was amended and renumbered section 287 by Senate Bill No. 1494 (Reg. Sess. 2017-2018). (Stats. 2018, ch. 423, § 49.) The former section 288a offenses at issue in this case now appear at section 287 without material substantive change. (See § 287, Stats. 2013, ch. 282, § 1.)

30 Cal.4th 342, 396, 403 [it is the jury's role to resolve the inconsistencies and conflicts in the evidence]) and add facts throughout the Discussion section where necessary to resolve the issues raised on appeal. For purposes of clarity and consistency we refer, as the parties did in the trial court and in their appellate briefs, to the alleged victims in this case as John Doe 1, John Doe 2, and John Doe 3 (hereafter, JD1, JD2, and JD3, collectively John Does).

The John Does are related to defendant, who was in his late 30s and early 40s when the incidents giving rise to this case occurred. JD1 and JD2 are defendant's first cousins once removed; they are the sons of defendant's cousin.[3] JD3 is defendant's nephew; he is the son of defendant's identical twin brother, J.C. As we describe *post*, the molestations in this case occurred over the course of several years when the John Does were between the ages of nine and 15. The molestations occurred at three different homes where defendant resided; the homes were located in Auburn, Grass Valley, and Lincoln.

Defendant did not testify at trial. The defense theory was that the John Does fabricated their claims of molestation. Because there was no evidence presented at trial to corroborate the alleged molestation, the outcome of this case hinged on whether the jury believed the John Does, each of whom testified at trial. Next, we briefly summarize the evidence supporting defendant's convictions.[4]

---

[3] JD1 and JD2 are half-brothers; they share the same father. JD2 is about five-and-a-half years older than JD1. At the time of trial, there were six boys in their family.

[4] We recognize that there was evidence adduced at trial supporting the conclusion that the John Does were dishonest. There was also inconsistent and conflicting evidence presented at trial as to the claims of molestation made by JD1 and JD2, including if, when, and where certain acts happened. However, because the jury found defendant guilty as charged and we summarize the evidence in the light most favorable to the verdicts, we need not and do not summarize that evidence.

*JD1 (Counts One, Two, and Three)*

JD1 was born in May 2008. He turned 11 years old two days before he testified at trial.

*Trial Testimony*

In 2017, JD1 and his family celebrated Thanksgiving at defendant's home in Lincoln. At that time, JD1's relationship with defendant was "unique" and "special." Defendant referred to JD1 as his favorite, gave JD1 special attention, treated JD1 as a best friend, and made JD1 feel special and loved. JD1 was nine years old.

JD1 and JD2 stayed at defendant's house from the Wednesday night before Thanksgiving to that Sunday, November 22, 2017 to November 26, 2017. We refer to this time period as the 2017 Thanksgiving holiday. The other members of JD1 and JD2's family went home on the Friday after Thanksgiving.

Except for Saturday night, JD1 slept with defendant in his downstairs bedroom during the 2017 Thanksgiving holiday. At trial, JD1 explained that defendant touched him between his legs in the "wrong parts" (i.e., his "wiener") while they were in bed at night. JD1 noted that defendant's mouth touched his "wiener" more than once while they were in defendant's bed at night, and that it felt "[d]isturbing." When JD1 told defendant to stop, he refused, which made JD1 feel nervous. JD1 also testified that defendant sodomized him "[u]pstairs," although he did not specify whether the sodomy occurred during the 2017 Thanksgiving holiday.

On April 11, 2018, JD1 met with a Child Protective Services (CPS) social worker, Gilka Marian, who was conducting an investigation unrelated to defendant. During that interview, JD1 disclosed that defendant had orally copulated him. JD1 explained that this incident occurred at defendant's home in Lincoln over the 2017 Thanksgiving holiday. JD1 said to Marian: "You know when you suck on a sucker? [Defendant] did that to me where I go pee-pee." He explained that he did not immediately report this incident because defendant told him to keep it a secret.

4

Later that same day, JD1's mother learned that defendant had done something inappropriate to JD1. JD1 explained to her that defendant told him not to tell anyone.

When JD1's mother testified, she recalled an incident that occurred around New Year's 2018 where defendant slapped JD1 in the face and spanked him with a belt. She explained that defendant believed JD1 had broken a record player and lied about doing so. JD1's mother noted that defendant's actions made JD1 upset, hurt, and confused. There was also evidence that defendant spanked JD1 with a belt on another occasion after JD1 lied about taking gum that was not his.

*JD1's Forensic Interview*

On April 19, 2018, JD1 participated in a forensic interview, which was recorded (video and audio) and played for the jury. JD1 was nine years old.

Over the course of the interview, JD1 described several instances of molestation that occurred at defendant's home in Lincoln during the 2017 Thanksgiving holiday. JD1 initially indicated that defendant orally copulated and sodomized him while he was in bed in defendant's downstairs bedroom. As for the oral copulation, JD1 explained that defendant rolled him over, pulled his pants down, and sucked his "pee-pee." JD1 further explained that when he tried to turn away, defendant rolled him over, and continued to suck his "pee-pee." Defendant also orally copulated him the next morning.

As for the sodomy, JD1 specifically recalled an incident that occurred in the morning during the 2017 Thanksgiving holiday. JD1 explained that he decided to sleep in an upstairs bedroom with JD2 after defendant molested him downstairs, and that defendant put his "pee-pee" in JD1's butt while JD1 was asleep the next morning. In recalling this incident, JD1 described how defendant's body was moving back and forth. He also noted that he felt "[s]haky, weird" and told defendant to stop. JD1 explained that, after he put his clothes "back up," defendant became angry and asked JD1 why JD1 would not let him "do it." Because defendant was mad, JD1 let him do "it again." JD1 explained that he complied because defendant would spank him with a belt and he did not

5

want to get "beat." When asked for more details about this incident, JD1 said that he did not want to "keep on explaining the same thing," but noted that JD2 could describe the incident because he was in the bedroom when it occurred.

JD1 explained that he disclosed defendant's molestation to his mother because defendant was being rude to JD2; defendant was hitting JD2 in the face and slapping JD2's "butt" with a belt.

*JD2's Testimony About JD1 and Defendant*

When JD2 testified, he recalled an incident that occurred in Lincoln after Thanksgiving day. JD2 explained that he was cooking lunch when he heard JD1 call out for help, and that when he went into defendant's downstairs bedroom, he saw that defendant and JD1 were both naked, JD1 was crying, and defendant was "sucking [JD1's] dick." JD2 further explained that he left to check on the food he was cooking and when he returned defendant and JD1 were under a blanket and defendant's body was going back and forth on JD1. When JD2 moved the blanket, he saw defendant's penis in JD1's "butt." JD2 also indicated that he saw JD1 "sucking [defendant's] dick" during this incident.

JD2 took JD1 outside so he could calm down and stop crying and yelling. While they were outside, JD1 said that he was "very uncomfortable with what he did," and that he was hurting "bad" because "it went in too deep."

*JD2 (Counts Four through Eight)*

JD2 was born in October 2002. He was 16 years old at the time of trial.

*Trial Testimony*

In June 2017, approximately six months prior to the incidents of molestation involving JD1, JD2's parents sent him to live with defendant in Lincoln. At that time, JD2 was not doing well in school and there were problems at home. Although JD2 enjoyed living with defendant, he did not like that defendant yelled "a lot in [his] face"

6

and spanked him with a belt. JD2 explained that he was afraid of being hit with the belt because it hurt.

At some point between Thanksgiving and Christmas 2017, defendant's family and JD2 moved to Grass Valley. JD2 was 15 years old.

JD2 moved back to his parents' home on April 12, 2018, the day after JD1 disclosed defendant's molestation. That same day, JD2 disclosed defendant's molestation to his father, step-mother, and some of his siblings. When asked, JD2 said that he was "kicked out" of defendant's house because he stole from defendant, although he also indicated that he moved back home due to JD1's disclosure of defendant's molestation.

The next day, April 13, 2018, JD2 met with the CPS social worker (Marian). During that meeting, JD2 was uncomfortable and "very upset." He reported that defendant had touched both him and JD1 in a sexual way about five or six times. He said defendant had repeatedly touched his penis as recently as about a month earlier.

At trial, JD2 described various incidents of molestation that occurred at defendant's home in Grass Valley, which largely took place at night after JD2 fell asleep. JD2 explained that defendant orally copulated him multiple times. In one of those incidents, defendant came into JD2's bedroom at night while he was asleep, pulled his pants down, and orally copulated him until he woke up and told defendant to "get out." JD2 also explained that he was forced to orally copulate defendant on one or two occasions. In one of those incidents, defendant came into JD2's bedroom at night and threatened to "beat" him with a belt if he refused to comply.

During his testimony, JD2 recalled several other instances of molestation, including an incident where defendant pulled his pants down while he was asleep and sodomized him, an incident where defendant ejaculated on his face while he was asleep, an incident where he woke up and defendant was in his bed touching his leg, and an

7

incident where defendant attempted to orally copulate him. JD2 also noted that defendant attempted to "rape" him more than once.

*JD1's Forensic Interview*

During his forensic interview, JD1 described an uncharged incident of molestation involving JD2 that occurred at defendant's home in Lincoln over the 2017 Thanksgiving holiday. JD1 explained that he was sleeping in the same bedroom as JD2 and woke up to "[n]oises" in the morning and defendant "doing it" to JD2. JD1 saw defendant orally copulate and sodomize JD2; defendant put his penis "[r]ight in the hole." Thereafter, JD2 told JD1 that defendant had orally copulated and sodomized him.

*JD3 (Count Nine)*

JD3 was born in June 2001. He was 17 years old at the time of trial. JD3 is the son of defendant's identical twin brother, J.C.

In early November 2014, JD3's family was evicted from their home in Roseville, approximately seven months before JD3 completed the seventh grade and turned 14 years old in June 2015. At some point when JD3 was in the seventh grade, his family moved into defendant's home in Auburn. One night when JD3 was 13 or 14 years old, he woke up hot and discovered that defendant was in his bed, spooning him and touching his penis "like he was trying to grab it." JD3 immediately got out of bed and went to the bathroom. When asked, JD3 recalled that there was a fire burning in the wood fireplace, which made his bedroom really warm.

JD3 told three friends about this incident but did not report it to his parents because he did not think they would believe him. JD3 explained that his mother and father thought everything he said was a lie, and that he did not trust anyone in his family because they had never showed "support or care." Below, we set forth JD3's testimony explaining why he had a bad relationship with his family, particularly his parents.

In May 2018, after defendant had been arrested on charges related to JD1 and JD2, JD3 disclosed defendant's molestation to medical personnel while he was hospitalized

8

due to stomach pain.[5]  At that time, JD3 was a sophomore in high school.  When asked, JD3 explained that his friends encouraged him to disclose the molestation because CPS "need[ed] to know everything."  JD3 also said that "It had to come out."  On cross-examination, JD3 acknowledged that he had used drugs ("Molly" and "coke") before he was hospitalized, and that he smoked marijuana.

As we discuss in more detail *post*, JD3's disclosure of defendant's molestation occurred several months after defendant and one of his sons, R., posted flyers at JD3's school and the schools attended by his siblings.  The flyers accused JD3 of molesting his own sister and claimed that JD3's mother was "unfit."

## DISCUSSION

### I

### *Sufficiency of the Evidence*

Defendant makes several insufficiency of the evidence claims, which we address in turn next.  As we shall explain, we find no merit in these claims.

A.  *Standard of Review*

In a challenge to the sufficiency of the evidence supporting a conviction, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the

---

[5]  In an interview that occurred the next day, JD3 claimed that defendant had molested him when he was in the sixth grade.  However, as we discuss *post*, the evidence adduced at trial showed that this incident of molestation occurred when JD3 was in seventh grade or shortly after he completed seventh grade.

9

judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)  " 'We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106 (*Brown*).)

" 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)  We must accept all logical inferences that the jury may have drawn from circumstantial evidence.  (*People v. Maury, supra*, 30 Cal.4th at p. 396.)  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 358.)

"The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.)  It is well-settled that " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

The substantial evidence test applies when an appellate court is reviewing the sufficiency of the evidence to support a conviction in the context of a motion for acquittal pursuant to section 1118.1.  (*People v. Stevens* (2007) 41 Cal.4th 182, 200.)  " 'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.]  The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.]  The sufficiency of the

evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review." (*Ibid.*)

B. *Count Nine--Lewd and Lascivious Act Upon JD3*

Defendant contends there was insufficient evidence to support his conviction on count nine, which charged him with committing a lewd and lascivious act upon JD3 when JD3 was under the age of 14 years (§ 288, subd. (a)), and that the trial court erred in denying his motion for acquittal on this ground after the close of the prosecution's case-in-chief. The trial court also denied defendant's motion for new trial on this ground. Defendant argues that reversal is required because there is no substantial evidence establishing that JD3 was under the age of 14 at the time of the offense, both at the close of the prosecution's case-in-chief and at the close of the entire case.

JD3, a prosecution witness, testified that he was born on June 7, 2001. Thus, the question for us is whether substantial evidence supports the jury's determination that JD3 was molested by defendant before June 7, 2015. Viewing, as we must, the evidence in the light most favorable to the judgment, we conclude there was sufficient evidence to support the jury's finding that JD3 was under the age of 14 years at the time of the offense charged in count nine.

Prior to the close of the prosecution's case-in-chief, the parties stipulated to the admission of an unlawful detainer judgment, which showed that JD3's family was evicted from their home in Roseville on November 3, 2014, approximately seven months before JD3 turned 14 years old.[6] JD3 testified that he was in seventh grade at the time of the eviction, he was 13 years old during the entirety of his seventh grade year, his family

_____

[6] On cross-examination, JD3 explained that his family was evicted from their Roseville home at "the end of 6th grade year starting 7th grade [year]," and that he did not know if the eviction occurred in 2014. When he was asked whether it would help refresh his memory to review an exhibit consisting of eviction records, he said "no." The parties subsequently stipulated to the admission of the unlawful detainer judgment.

11

moved into defendant's home in Auburn when he was in the seventh grade, he was molested by defendant a month or two later, and there was a fire in the wood fireplace that night. Although JD3 also testified that he lived with defendant during his seventh and eighth grade years when he was "[a]bout 13, 14," that his family moved to defendant's home in Auburn during the summer after he completed seventh grade, and that his family lived in hotels for about a year after they were evicted from their home in Roseville, there was sufficient evidence from which a reasonable jury could have found that he was under the age of 14 years at the time of the abuse.

Ultimately, the jury decided that defendant molested JD3 before June 7, 2015, that is, when JD3 was 13, not 14 years old. That was a reasonable inference based on the evidence presented, both at the close of the prosecution's case-in-chief and at the close of the entire case.[7] The fact that JD3 testified in a contradictory manner about the timing of the molestation does not mean his testimony was insufficient to support a finding on that point. It merely raised a credibility issue for the jury to resolve. (*People v. Young* (2005) 34 Cal.4th 1149, 1181; see *People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1323-1324 [jury was entitled to resolve conflict as to when a lewd act occurred where evidence suggested the act may have occurred when the victim was 16, not 15 years old]; *People v. Mejia* (2007) 155 Cal.App.4th 86, 98-99[jury was entitled to resolve conflict as to whether two lewd acts occurred in one month when there was evidence suggesting only one lewd act occurred in that month].) On this record, we cannot conclude that " ' " 'upon no hypothesis whatever is there sufficient substantial evidence to support' "

---

[7] During the defense case, additional evidence was presented that supported the jury's verdict on count nine. There was evidence that JD3's family lived at hotels for only a few months after they were evicted from their home in November 2014, and that JD3's family moved into defendant's home in Auburn while JD3 was in the seventh grade. In addition, JD3's mother testified that it was "common" that a fire would be burning all night in the wood stove during the winter, and that she could not recall any occasion when the wood stove was used in the summertime.

12

the jury's verdict.' " (*People v. Penunuri, supra*, 5 Cal.5th at p. 142.) We therefore reject defendant's contention that reversal is required on count nine due to insufficient evidence.

*Mejia*, on which defendant relies, is distinguishable. In *Mejia*, the court held that there was insufficient evidence to support a conviction for continuous sexual abuse of a child under the age of 14 years, which required the prosecution to prove the defendant engaged in three or more acts of sexual abuse over a period of not less than three months. (*People v. Mejia, supra*, 155 Cal.App.4th at pp. 93-94.) Because the evidence did not show exactly when the abuse began, there was no inference for the jury to draw to support a conviction. (*Id*. at pp. 94-95 [concluding that the only reasonable inference permitted by the evidence was that the defendant's abuse began sometime in June and continued to some date in September, but the jury could only speculate that the first incident occurred early enough in June to satisfy the 90-day requirement expiring on September 17, 2004, the day before the alleged victim's 14th birthday].) Here, by contrast, there was evidence from which the jury could have reasonably inferred that JD3 was molested before he turned 14 years old, as we have discussed *ante*.

C. *Count Five--Oral Copulation of an Unconscious Person (JD2)*

Next, defendant contends there was insufficient evidence to support his conviction on count five, which charged him with orally copulating an unconscious person (JD2) (former § 288a, subd. (f) [now § 287, subd. (f)]),[8] and that the trial court erred in denying his motion for acquittal on this ground after the close of the prosecution's case-in-chief. Defendant argues that reversal is required because JD2 was conscious and aware of the

_____

[8] Section 287, subdivision (f) became effective prior to the commencement of trial. (Stats. 2018, ch. 423, § 49, eff. Jan. 1, 2019 [renumbering and amending former § 288a, subd. (f)].) As we noted *ante*, this provision is substantively similar in all material respects to the charged offense, former section 288a, subdivision (f). (Stats. 2013, ch. 282, § 1.)

13

oral copulation when it occurred, and therefore no evidence supports the jury's determination that he was "unconscious" within the meaning of the statute. We disagree.

As relevant here, section 287, subdivision (f) provides: "Any person who commits an act of oral copulation, and the victim is at the time unconscious of the nature of the act and this is known to the person committing the act, shall be punished by imprisonment in the state prison for a period of three, six, or eight years. As used in this subdivision, 'unconscious of the nature of the act' means incapable of resisting because the victim meets one of the following conditions: [¶] (1) Was unconscious or asleep. [¶] (2) Was not aware . . . that the act occurred." It is settled that a victim need not be totally and physically unconscious in order for the statute to apply. (*People v. Lyu* (2012) 203 Cal.App.4th 1293, 1299-1300 [interpreting § 289, subd. (d) (sexual penetration of an unconscious person by a foreign object) and former § 288a, subd. (f)]; see *People v. Howard* (1981) 117 Cal.App.3d 53, 55 [interpreting former § 288a, subd. (f) and rejecting defense argument that "unconsciousness must be total, i.e., a total unawareness that the physical act is being performed"].)

Viewing the evidence in the light most favorable to the judgment, we conclude there was sufficient evidence to support the jury's determination that JD2 was "unconscious" within the meaning of section 287, subdivision (f), both at the close of the prosecution's case-in-chief and at the close of trial. JD2 testified that defendant came into his bedroom one night while he was asleep and attempted to pull his pants down. JD2 explained that he "kept turning over" but defendant "kept pulling [him] and stuff like that," and that defendant used his fingernails to pull JD2's pants all the way down. JD2 further explained that he became "uncomfortable" and woke up when defendant "kept sucking [his] dick."

Although JD2's testimony indicates that he had some awareness of defendant's conduct in pulling his pants down, he clearly testified that he woke up *while* defendant was orally copulating him. "As with other facts, the direct testimony of a single witness

14

is sufficient to support a finding unless the testimony is physically impossible or its falsity is apparent 'without resorting to inferences or deductions.' " (*People v. Cudjo* (1993) 6 Cal.4th 585, 608.) JD2's testimony was neither physically impossible nor apparently false.

As the Attorney General points out, "there is no bright line that distinguishes consciousness from sleep." (*Burdine v. Johnson* (S.D. Tex. 1999) 66 F.Supp.2d 854, 865.) Under the facts of this case, the jury could have reasonably inferred that JD2 was only partially conscious when defendant was pulling his pants down, and that JD2 did not fully awake until defendant was orally copulating him. By then, a violation of section 287, subdivision (f) had already occurred. In short, we are satisfied that there was sufficient evidence from which a reasonable jury could have concluded that JD2 was "unconscious of the nature of the act," that is, incapable of resisting defendant at the moment when defendant first began to orally copulate him. (§ 287, subd. (f).) Substantial evidence thus supports defendant's conviction on count five.

Defendant's reliance on *Lyu* is unavailing, as that case is clearly distinguishable. In *Lyu*, the female victim was sexually assaulted during an ordinary massage. (*People v. Lyu, supra*, 203 Cal.App.4th at pp. 1295-1296.) She was not unconscious or asleep. Rather, she was fully awake and "instantly knew, perceived, and was cognizant" that the defendant had assaulted her. (*Id*. at p. 1301.)

We decline to consider defendant's contention that reversal is required because the prosecution failed to prove he knew JD3 was unconscious of the nature of the act, i.e., the oral copulation. Defendant did not raise this issue in the trial court or in his opening brief on appeal. (*In re Campbell* (2017) 11 Cal.App.5th 742, 756-757 [declining to address argument raised for the first time on appeal]; *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [refusing to address argument raised for the first time in the reply brief].)

D. *Convictions Involving JD1 and JD2 (Counts One through Eight)*

Finally, defendant contends there was insufficient evidence to support his conviction on any of the counts involving JD1 and JD2 (i.e., counts one through eight). Defendant argues that reversal is required because JD1's and JD2's trial testimony was so vacillating, conflicting, inherently improbable, and transparently fabricated that no rational jury could rely on it as a basis to convict.

It is the exclusive province of the jury to resolve conflicts and inconsistencies in the testimony, and the testimony of a single witness is sufficient to support a conviction, unless the testimony is " 'physically impossible or inherently improbable.' " (*Brown, supra*, 59 Cal.4th at p. 106.) "Inherently improbable . . . means that the challenged evidence is 'unbelievable per se,' such that 'the things testified to would not seem possible.' [Citation.] The determination of inherent improbability must be made without resort to inference or deduction, and thus cannot be established by comparing the challenged testimony to other evidence in the case." (*People v. Ennis* (2010) 190 Cal.App.4th 721, 725, italics omitted (*Ennis*).) "While an appellate court can overturn a judgment when it concludes the evidence supporting it was 'inherently improbable,' such a finding is so rare as to be almost nonexistent. ' "To warrant the rejection of the statements given by a witness who has been believed by [the trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." ' " (*Id*. at p. 728.)

"The inherently improbable standard addresses the basic content of the testimony itself—i.e., could that have happened?—rather than the apparent credibility of the person testifying." (*Ennis, supra*, 190 Cal.App.4th at p. 729.) "In other words, the challenged evidence must be improbable ' "on its face." ' " (*Ibid*.) "The only question is: Does it seem *possible* that what the witness claimed to have happened actually happened?" (*Ibid*.) To reject testimony as inherently improbable, it must be " 'so inherently incredible, so contrary to the teachings of basic human experience, so completely at odds

16

with ordinary common sense, that no reasonable person would believe it beyond a reasonable doubt.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 996; see *Ennis*, at p. 729 [" 'Testimony may be rejected only when it is . . . " 'unbelievable per se,' " physically impossible or " 'wholly unacceptable to reasonable minds' " ' "].)

Having reviewed the portions of the record relied upon by defendant, we conclude he has failed to show that the evidence supporting his convictions was physically impossible or inherently improbable "on its face." In making this argument, defendant misapprehends the "inherently improbable" standard; he points out inconsistencies and conflicts in the evidence and then resorts to inferences and deductions to argue that no reasonable jury could credit JD1's and JD2's claims of molestation beyond a reasonable doubt. Defendant argues that their "stories" of abuse were "transparent fabrications" and that their testimony was " 'in one part or another, perjurious.' " Defendant, in essence, invites us to reweigh the evidence and disagree with the jury's credibility determinations. We cannot and will not do that. (*Ennis, supra*, 190 Cal.App.4th at p. 725 [inherent improbability claim based entirely on comparisons, contradictions, and inferences amounts to nothing more than an attack on witness credibility and cannot provide a basis for reversal on appeal].) In short, because there was physically possible and plausible evidence supporting the convictions on the counts involving JD1 and JD2, and the jury found that evidence credible despite the purported weaknesses to which defendant points on appeal, we cannot second-guess those determinations. (See *People v. Hovarter, supra*, 44 Cal.4th at p. 996 [except in rare instances of demonstrable falsity, doubts about the credibility of a witness should be left for the jury's resolution].) Accordingly, defendant's inherent improbability claim fails.

Defendant's reliance on *People v. Casillas* (1943) 60 Cal.App.2d 785 is misplaced. In *Casillas*, the appellate court determined that the evidence relied upon by the prosecution was so improbable as to be incredible, and therefore reversed the defendant's convictions. (*Id.* at pp. 794-795.) The court found that the alleged victim's

testimony, which included claims that her father had sexual intercourse with her on direct and redirect examination and recantations of the abuse on cross and recross examination, "so lacking in substantiality as to truth or credibility that it falls far short of that quantum of verity, reasonableness and substantiality required by law in criminal cases." (See *id.* at pp. 791-794 [explaining that the alleged victim gave three separate, distinct, and contradictory versions as to what had happened, including claiming that a boy named Manuel was responsible for her pregnancy].)  Because the circumstances of this case are not analogous to *Casillas*, no further discussion of that case is required.  We do not express any opinion as to whether we agree with its reasoning.

II

*Alleged Evidentiary Errors*

Defendant challenges a number of the trial court's evidentiary rulings, which we address in turn below.  As we shall explain, we find no reversible error.  Because we reach the merits of defendant's claims, we need not and do not consider the Attorney General's forfeiture arguments.

A. *Excluded Cross-Examination of JD1*

Defendant contends the trial court prejudicially erred by limiting the cross-examination of JD1 on the subject of where the offense charged in count one (sodomy) occurred in violation of his constitutional right to confrontation.  He argues that reversal is required because the trial court denied him the opportunity to test JD1's credibility, knowledge, and recollection as to this offense.

1. *Additional Background*

Defendant was charged in count one with unlawful sexual intercourse or sodomy with JD1 when JD1 was 10 years of age or younger and defendant was 18 years of age or older.  (§ 288.7, subd. (a).)  As pointed out by the prosecutor in her opening statement, the basis for this count was JD1's claim in his forensic interview that defendant sodomized him in Lincoln during the 2017 Thanksgiving holiday.

18

On direct examination, the prosecutor did not ask JD1 whether he had been sodomized by defendant. On cross-examination, JD1 initially (and repeatedly) denied that he had been sodomized by defendant and claimed that he had lied when he accused defendant of sodomy in his forensic interview. When asked, JD1 specifically denied that defendant, "[o]ver Thanksgiving," had "put his private part in [JD1's] rear end when [JD1 was] upstairs in [JD2's] bedroom." Later, however, JD1 said that defendant did something "inappropriate" to him during the Thanksgiving holiday, that JD2 was in the room when it happened, and that JD2 was in the room every time it happened. Upon further questioning and after a portion of JD1's forensic interview was played for the jury, JD1 testified that he saw defendant "putting his private part into [JD2's] rear end" during the daytime over "Thanksgiving break." JD1's testimony in this regard was consistent with what he said in his forensic interview. Shortly thereafter, the trial court recessed for the day.

When cross-examination resumed the next day, JD1 testified that he saw defendant put his "wiener" into JD2's "butt" over the Thanksgiving holiday in an upstairs room. Thereafter, JD1 accused defendant of sodomizing *him*. JD1 explained that defendant put his "pee-pee" in JD1's "butt," and that he reported this incident to a "lady" at his school. The following exchange then occurred:

"Q. Where did that happen?

"A. Upstairs.

"Q. At the house with the pond [i.e., the house in Grass Valley] or the other house where you were at Thanksgiving [i.e., the house in Lincoln]?

"THE COURT: That question has been asked and answered. This is repetitive. Please move on."

On redirect examination, JD1 testified that he told the truth during his forensic interview. Thereafter, his entire forensic interview was played for the jury.

19

2. *Analysis*

"The Confrontation Clause of the Sixth Amendment gives the accused the right 'to be confronted with the witnesses against him.' This has long been read as securing an adequate opportunity to cross-examine adverse witnesses." (*United States v. Owens* (1988) 484 U.S. 554, 557; see *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 841-842 [the constitutional right of confrontation includes the right to cross-examine adverse witness on matters reflecting on their credibility], disapproved on another ground by *People v. Dalton* (2019) 7 Cal.5th 166, 214.) Not every restriction on a defendant's cross-examination, however, violates the Constitution. "The trial court retains wide latitude to restrict repetitive, prejudicial, confusing, or marginally relevant cross-examination. Unless the defendant can show that the prohibited cross-examination would have created a significantly different impression of the witness's credibility, the trial court's exercise of discretion to restrict cross-examination does not violate the constitutional right of confrontation." (*People v. Sanchez* (2016) 63 Cal.4th 411, 450-451.)

" ' "Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 ." [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error.' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159.)

Even assuming the trial court erred in preventing defense counsel from cross-examining JD1 as to where the sodomy occurred, we see no constitutional violation or prejudice. JD1's forensic interview, which was played for the jury, made clear that JD1 accused defendant of sodomizing him multiple times during the 2017 Thanksgiving holiday at defendant's home in Lincoln; the first incident occurred in defendant's downstairs bedroom at night, while the second incident occurred later in an upstairs bedroom in the morning. JD1 also testified at length at trial, which provided ample opportunity for the jury to assess his credibility. Defense counsel's cross-examination of

20

JD1 provided reasons for the jury to doubt his credibility. In closing argument, counsel highlighted JD1's conflicting and inconsistent statements regarding defendant's molestation and argued that JD1 lacked credibility, including with regard to his claim of being sodomized by defendant. Counsel specifically pointed out that JD1 testified that defendant never sodomized him. Counsel also argued that JD1 had a motive to fabricate his claims of molestation; specifically, his anger at defendant for the way in which defendant treated him and his brother (JD2), including physically disciplining them and making JD2 move back home. Under the circumstances presented, we see no reasonable probability the jury would have received a significantly different impression of JD1's credibility had the trial court permitted defense counsel to ask JD1 to specify whether defendant sodomized him in Lincoln or Grass Valley. In any event, we are convinced beyond a reasonable doubt that the jury would have reached the same verdict absent the asserted error. It is apparent that, despite the conflicting evidence about the specifics of the allegation comprising count one, the jury credited the evidence supporting a conviction.

B. *Excluded Testimony Regarding JD1's Character for Truthfulness*

Next, defendant contends the trial court prejudicially erred in prohibiting JD1's brother, C., from testifying about JD1's character for truthfulness.

1. *Additional Background*

At trial, JD1's older brother, C., then age 14, testified as a prosecution witness before JD1 testified. On cross-examination, C. was asked whether JD1 had a hard time telling the truth sometimes, and whether JD1 made up stories. The trial court sustained the prosecutor's relevancy objection to both of these questions. Immediately thereafter, defense counsel asked C. whether JD1 had ever lied to him. The trial court sustained the prosecutor's objection on the grounds of relevancy and improper impeachment.

At defense counsel's request, a sidebar conference was held. During the discussion, defense counsel explained that he was attempting to establish that JD1 had a

21

reputation for being a liar, and argued that "[i]mpeachment of a witness with a reputation for lying . . . is an appropriate area to pursue." In response, the prosecutor noted that JD1 had not testified yet, and objected to defense counsel's questions on the grounds of relevancy, improper character evidence, and improper impeachment. The trial court sustained the prosecutor's objections, and added that defense counsel's questions were improper because they were "vague and open-ended as to time."

    2. *Analysis*

"Evidence of a witness's character for truthfulness, or its opposite, is relevant to credibility and admissible for this purpose. [Citation.] This evidence may be shown by '(a) evidence of specific instances of conduct, (b) opinion evidence, or (c) reputation evidence.' " (*People v. Bell* (2019) 7 Cal.5th 70, 106.) " 'An individual who has known a witness for a reasonable length of time or who knows the reputation of that witness for honesty and veracity in the community may qualify to testify as to the witness' character for honesty or veracity.' " (*Id*. at p. 107.) Thus, we assume error here.

Evidentiary rulings are generally subject to harmless error review under the standard in *People v. Watson* (1956) 46 Cal.2d 818, which requires us to determine if a reasonable probability exists that the jury would have reached a result more favorable to the defendant absent the error. (*People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Gallardo* (2017) 18 Cal.App.5th 51, 76; see *People v. Jones* (2013) 57 Cal.4th 899, 957 ["because the trial court merely excluded some evidence that could have impeached a complaining witness and did not preclude defendant from presenting a defense, any error would be one of state evidentiary law only"].) Here, the error was harmless.

The jury had ample opportunity to assess JD1's credibility; he testified at length at trial, at times inconsistently, and his entire forensic interview was played for the jury. As we have already discussed, there was ample evidence adduced at trial that undermined his credibility, including his own conflicting and inconsistent statements about defendant's molestation. There was also evidence that JD1 had lied on occasion about relatively

22

minor matters, including when he was accused of breaking defendant's record player and taking gum that did not belong to him.  In his interview with Marian, JD1 claimed to be a "liar" when he was asked if he knew the difference between the truth and a lie, although he was laughing when he made this statement.  On this record, we conclude it is not reasonably probable that a result more favorable to defendant would have been reached absent the error.  As for the counts involving JD1, either the jury believed him despite clear evidence of conflicting statements or it did not.  It is not reasonably probable the jury would have reached a different result on these counts even had C. testified that JD1 had credibility issues.  Such evidence would have been cumulative and its impeachment value would have been minimal compared to the other more compelling evidence casting doubt on JD1's credibility.

We reject defendant's contention that the effect of the trial court's evidentiary ruling should be evaluated under the harmless error standard articulated in *Chapman v. California, supra*, 386 U.S. 18, which is reserved for errors of a constitutional dimension. (*Id*. at p. 24.)  Unless a trial court's ruling completely excludes evidence of an accused's defense, the proper standard of review for an evidentiary ruling is the reasonable probability standard articulated in *People v. Watson, supra*, 46 Cal.2d 818.  (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103; *People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4.)  Although not entirely clear, it appears that the challenged evidentiary rulings were based in part on the fact that JD1 had not yet testified at the time C. was testifying.  The trial court's rulings did not prevent the defense from calling character witnesses to impeach JD1's credibility, including C., who was excused as a prosecution witness "[s]ubject to recall."  Indeed, the record discloses that defendant was permitted to elicit testimony from various witnesses that JD2 and JD3 were generally dishonest.

23

C. *Excluded Cross-Examination of JD1 Regarding Alleged False Report of Molestation*

Next, defendant contends the trial court prejudicially erred in preventing him from cross-examining JD1 about an alleged prior false report of molestation he made against his brother, JD2. We disagree.

1. *Applicable Legal Principles*

Generally, an alleged victim of sexual assault may not be questioned about specific instances of their prior sexual activity. (Evid. Code, § 1103, subd. (c) (1); *People v. Woodward* (2004) 116 Cal.App.4th 821, 831.) Evidence Code section 782 provides a limited exception to that general rule and allows evidence of prior sexual conduct if it is "offered to attack the credibility of the complaining witness." (Evid. Code, § 782, subd. (a); *People v. Fontana* (2010) 49 Cal.4th 351, 362.) However, evidence of a complaining witness's prior false report of molestation is not evidence of "sexual conduct" as defined by Evidence Code section 782. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1454-1456 [Evid. Code, § 782 inapplicable in sexual assault case in which victim was alleged to have made prior false report of rape "because it was [the complaining witness's] allegedly false complaints that the defense sought to use as impeachment evidence, not her prior sexual conduct or willingness to engage in sexual activity"].) A prior report of molestation or rape is relevant to the complaining witness's credibility only if the report is shown to be false. (*People v. Winbush* (2017) 2 Cal.5th 402, 469; *People v. Miranda* (2011) 199 Cal.App.4th 1403, 1424; *Tidwell*, at p. 457.)

2. *Additional Background*

Defendant filed a pretrial motion, supported by an affidavit filed under seal, seeking permission to introduce evidence of prior sexual conduct by JD1 and JD2 under Evidence Code section 782. As relevant here, defendant also sought to present evidence showing that JD1, in his interview with CPS social worker Marian, had falsely accused JD2 of sodomizing their younger brother, S., when JD2 was 14 years old. In support of his motion, defendant asserted that a prior false report of molestation was admissible

24

impeachment evidence, independent of Evidence Code section 782. The trial court issued a written order denying the motion. In so ruling, the court recognized that a prior report of molestation by a complaining witness is not admissible unless there is credible evidence that the report was false, although the court did not specifically identify this ground as one of the reasons for denying the motion.

At trial, defense counsel sought permission at a sidebar conference to question C. about whether JD1 had ever falsely accused C. or any of their siblings of improper sexual conduct. The trial court denied the request, relying in part on its pretrial ruling under Evidence Code section 782. The court also found that the evidence was inadmissible under Evidence Code section 352 because an inquiry into this issue would be "unduly consuming of time and not probative given the subject matter." Thereafter, the trial court denied a similar request made by defense counsel at a sidebar conference while JD1 was testifying, referencing its pretrial ruling under Evidence Code section 782. The court also agreed with the prosecutor's objections, which included defendant's failure to prove JD1 made a false report of sexual misconduct, and her assertion that the evidence the defense sought to elicit was irrelevant, improper impeachment, and inadmissible under Evidence Code section 352.

### 3. *Analysis*

Even assuming the trial court erred in relying on Evidence Code section 782, any error was harmless, as the evidence regarding JD1's allegedly false report of molestation was properly excluded on other grounds.

We review a trial court's relevancy and Evidence Code section 352 rulings for abuse of discretion. (*People v. Avila* (2006) 38 Cal.4th 491, 578.) No abuse of discretion appears on this record. Defendant did not present evidence in connection with his pretrial motion establishing that JD1 falsely accused JD2 of molesting their younger brother, S. As such, the trial court properly determined that JD1's accusation was not relevant for the purpose of impeaching his credibility. (*People v. Winbush, supra*, 2 Cal.5th at p. 469.)

25

Moreover, the proffered evidence was properly excluded under Evidence Code section 352, which "empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler* (1992) 4 Cal.4th 284, 295-297.) The trial court may exclude evidence under that section if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People v. Miles* (2020) 9 Cal.5th 513, 587; see also Evid. Code, § 352.)

Here, defendant sought to adduce evidence on a collateral credibility issue, which would have required the expenditure of time on a sensitive matter involving multiple minors, including JD2. Defendant's offer of proof was insubstantial, consisting of nothing more that JD1's allegedly false report of molestation in his interview with Marian, and defense counsel's assertion that this report was false because CPS records reflected that S., in an interview with Marian, denied that he had ever been sodomized by JD2. Further, the proffered evidence, even if true, had no direct bearing on the critical issue of whether defendant in fact molested JD1, and was cumulative to other evidence casting doubt on JD1's credibility, including his conflicting and inconsistent statements about the molestation. Under these circumstances, the trial court could have reasonably determined that the probative value of the proffered evidence (if any) was substantially outweighed by the probability that its admission would necessitate the undue consumption of time and create a substantial danger of undue prejudice. (See Evid. Code, § 352.) In our view, the trial court acted well within its discretion in excluding the evidence. Because the trial court's ruling was not an abuse of discretion, defendant's constitutional claim fails. (*People v. Johnson* (2022) 12 Cal.5th 544, 607; *People v. Panah* (2005) 35 Cal.4th 395, 484, fn. 32.)

We decline to consider defendant's contention, raised for the first time on appeal, that JD1's report of molestation against JD2 was admissible because, if true, JD2's

conduct was a crime involving moral turpitude, which was relevant to assessing JD2's credibility and gave him a motive to fabricate his allegations of molestation against defendant. (*People v. Case* (2018) 5 Cal.5th 1, 44; *In re Campbell, supra*, 11 Cal.App.5th at pp. 756-757.)

D. *Exclusion of Evidence Regarding JD1's Initial Disclosure*

Next, defendant contends the trial court prejudicially erred in excluding evidence about the circumstances surrounding JD1's initial disclosure of defendant's molestation in violation of his due process right to present a complete defense. Defendant argues that such evidence was admissible because it cast doubt on JD1's claims of molestation, as the CPS social worker conducting the interview (Marian) "prompted" and "steered" JD1 "down a path" toward accusing defendant of molestation via suggestive questioning. We see no error.

1. *Additional Background*

As previously indicated, JD1's initial disclosure of defendant's molestation occurred during an interview in April 2018 with Marian, a social worker who was conducting an investigation unrelated to defendant. Before Marian testified as a defense witness, defendant requested permission to question her about the circumstances surrounding JD1's disclosure of defendant's molestation. Among other things, defendant sought to elicit testimony from Marian that JD1 had been exposed to pornography and had accused JD2 of sodomizing their younger brother, S. In making this request, defendant explained that he wanted the jury to understand how the allegations of molestation against him came to light, to establish the "starting point" for the allegations, and to show how the interview "progresse[d]" and "unfold[ed]." The trial court denied defendant's request, finding that such testimony would violate its pretrial ruling under Evidence Code section 782.

After the prosecutor completed her cross-examination of Marian, which included questions about JD1's disclosure of defendant's molestation, defense counsel renewed his

27

request to question Marian about the circumstances surrounding JD1's disclosure. During a sidebar conference, defense counsel argued that the prosecutor had "opened up the entirety" of Marian's interview of JD1 under Evidence Code section 356,[9] and that in order to "protect due process" and preserve defendant's right to a fair trial, he should be permitted to elicit testimony about how defendant's name "came up" in the interview, which "goes to the credibility of [JD1]."

In denying defense counsel's request, the trial court stated: "Number 1, I don't think that [the] door was opened; two, even if it was, the evidence about the circumstances . . . would be subject to being excluded under Evidence Code § 352. It would . . . result in an undue consumption of time. We've litigated the basis and circumstances of the referral, and the evidence that would be admitted would be more prejudicial than probative, and that's the Court's ruling." Thereafter, the court denied defendant's motion for mistrial on the ground that he was denied the right to effectively question Marian, concluding that the evidence defendant sought to admit was inadmissible under Evidence Code sections 782 and 352, even if Evidence Code section 356 applied.

The trial court also denied defendant's motion for new trial on this ground.

---

[9] Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." The purpose of this section, known as the rule of completeness, is to " 'prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 460.)

2. *Analysis*

As an initial matter, we note that Marian's interview of JD1 is not included in the appellate record. It is appellant's burden to provide an adequate record for our review of his claims on appeal. Having reviewed defense counsel's proffer as to the contents of the interview, we are not persuaded that Marian's questioning was impermissibly suggestive. Instead, it appears the trial court reasonably concluded that any probative value of the evidence defense counsel sought to elicit from Marian would have been substantially outweighed by the probability that its admission would necessitate undue consumption of time and create a substantial danger of undue prejudice. Counsel sought to elicit, among other things, evidence about a sensitive and inflammatory matter, an alleged sexual assault by JD2 against his younger brother S. that had not been proven false but was merely disputed. In short, given the limited relevance of the inquiry proposed by defense counsel and its possible prejudicial effect, we see no abuse of discretion. Because we conclude the trial court properly excluded the evidence under Evidence Code section 352, we need not and do not consider whether the trial court erred in excluding the evidence on other bases. (See *Johnson, supra*, 12 Cal.5th at pp. 604-605 [evidence admissible under Evid. Code, § 356 subject to exclusion under Evid. Code, § 352]; *People v. Chandler* (1997) 56 Cal.App.4th 703, 707-708 [evidence admissible under Evid. Code, § 782 subject to exclusion under Evid. Code, § 352].) Since the trial court's evidentiary ruling was not an abuse of discretion, defendant's constitutional claim fails. (*Johnson*, at p. 607; *People v. Panah, supra*, 35 Cal.4th at p. 484, fn. 32.)

E. *Admission of Evidence that JD3's Father Molested Him*

Finally, defendant contends the trial court prejudicially erred in allowing JD3 to explain on redirect examination why he "hated" his father--defendant's identical twin brother J.C.--and his mother. Specifically, defendant challenges the admission of evidence that J.C. molested JD3.

29

### 1. *Additional Background*

After the original charging document was filed in this case, the prosecutor filed a motion to consolidate this action with a separate criminal action pending against defendant and J.C. on the grounds that they were both charged with the same class of crimes and offenses, the victims in both cases (including JD3) were related to them, and the evidence in both cases was cross-admissible. The trial court denied the motion to consolidate and granted defendant's motion to sever the sole charge filed against defendant in the separate criminal action, such that defendant and J.C. would be tried separately. Prior to the commencement of trial in this action, the prosecutor and defense counsel agreed that any evidence related to the charges filed against J.C. was irrelevant and would not be introduced in the prosecution's case-in-chief.

On cross-examination, defense counsel attempted to establish that JD3 had a motive to falsely accuse defendant of molesting him; namely, JD3's animosity toward his family. When defense counsel asked JD3 about his drug use and whether he blamed defendant for his "screwed-up" life, JD3 said, "Not just [defendant]." Upon further questioning, JD3 explained that he hated his parents and defendant because they were "assholes," and referred to his mother as a "piece of shit." JD3 also blamed his parents and brother for the suicidal thoughts he had before he began living with defendant. He explained that his parents favored his brother. When asked, JD3 indicated that his parents were "toxic people," that he hoped they would die, and that defendant would "rot in jail in hell."

At one point during cross-examination, defense counsel showed JD3 a photograph taken at his eighth grade graduation, which included JD3, J.C., and other family members. Immediately thereafter, defense counsel showed JD3 a photograph of defendant and JD3 at the same graduation. When asked, JD3 agreed that he and defendant appeared to be happy. As detailed *ante*, on direct examination, JD3 indicated that defendant molested him before he completed eighth grade. Thus, these photographs

30

were apparently introduced for the purpose of casting doubt on JD3's claim of molestation against defendant.

Near the end of cross-examination, defense counsel questioned JD3 about certain flyers defendant and his son, R., had posted at JD3's high school and the schools attended by JD3's siblings several months prior to JD3's disclosure of defendant's molestation. The flyers, which were posted when JD3 was a sophomore, accused JD3 of molesting his sister and claimed that his mother was "unfit." When asked, JD3 denied that the flyers made him angry, but said they made him feel sad, upset, and depressed.

After cross-examination was completed, a sidebar conference was held. During the discussion, the prosecutor requested permission to question JD3 about the flyers and about how his relationship with J.C. changed after J.C.'s arrest. Defense counsel agreed that it was appropriate for the prosecutor to question JD3 about the flyers but objected to the prosecutor questioning JD3 about the allegations against J.C., citing Evidence Code section 352. The trial court overruled the objection, stating that it would permit such questioning "subject to an appropriate question." In so ruling, the court explained that defense counsel's cross-examination of JD3 had opened the door to the admission of this evidence.

On redirect examination, JD3 explained that the flyers were posted at his school and the schools attended by his siblings after his sister accused defendant's son, R., of forcibly sexually assaulting her. JD3 further explained that defendant's conduct in posting the flyers made him feel sad and really upset. When asked, JD3 said that his eighth grade graduation was a "happy time," but that his life changed during his freshman year of high school. Over defense objections on the grounds of relevancy and Evidence Code section 352, JD3 was permitted to explain what his father J.C. had done to him during his freshman year. JD3 explained that J.C. started "drinking a lot more" and molested him, which was the reason why he referred to J.C. as an "asshole" during cross-examination. JD3 also noted that he was angry with his mother for not protecting him,

31

and that it made him feel really depressed when defendant encouraged him to kill himself during an incident that occurred after he was hospitalized.

Prior to deliberations, the jury was given the following limiting instruction: "During the trial, you have . . . heard certain evidence about [J.C.]. You may only consider this evidence for a limited purpose. You may only consider this evidence to evaluate the bias, interest, motives and credibility of [JD3 and others]. You may consider that evidence only for that purpose and for no other. You may not consider any evidence about [J.C.] to show that [defendant] committed any of the crimes charged in this case."[10]

The trial court denied defendant's request for a new trial on the ground that JD3 should have been prohibited from testifying that J.C. had molested him under Evidence Code section 352.

## 2. *Analysis*

Defendant contends the trial court abused its discretion in allowing the prosecutor to elicit evidence that his identical twin brother (J.C.) molested JD3. He argues that this evidence was irrelevant and inadmissible under Evidence Code section 352, as any probative value of the evidence was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. He argues the evidence had little or no relevance to any contested issue at trial, while creating a substantial danger that the jury would draw the

---

[10] This limiting instruction told the jurors that they could consider the evidence regarding J.C. to evaluate not only JD3's bias, interest, motives and credibility, but also the bias, interest, motives, and credibility of JD3's sister, JD3's mother, and JD2. The written limiting instruction given to the jury did not include JD2 but rather "J.C." Although unclear, the "J.C." in the limiting instruction appears to be a reference to JD3's brother. In any event, as we discuss *post*, we assume, without deciding, that the trial court erred in instructing the jury that the evidence regarding J.C. could be considered for any other purpose than to evaluate JD3's bias, interest, motives, and credibility.

improper propensity inference that defendant was genetically disposed to commit sexual offenses, given that J.C. was his identical twin. We disagree.

Under the doctrine of "opening the door," previously irrelevant testimony may become relevant and thereby admissible--or evidence that was relevant but otherwise inadmissible may become admissible--to avoid giving the jury a misleading impression of the evidence. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1248-1249; *People v. Kerley* (2018) 23 Cal.App.5th 513, 553.) But, "opening the door" does not justify admitting evidence that was *and remains* irrelevant. (Evid. Code, § 350; see *In re Lucas* (2004) 33 Cal.4th 682, 733.) A trial court's ruling on whether evidence is admissible under this theory is reviewed for abuse of discretion. (*Kerley*, at p. 553.)

We see no evidentiary error. Defense counsel elicited testimony as to JD's bad relationship with his family, which caused the question of *why* to become relevant. This is because the record reflects, and defendant acknowledges on appeal, that defense counsel, in questioning JD3 on cross-examination, attempted to establish a motive as to why JD3 would make false allegations of molestation--namely, JD3's "considerable ill-will" toward his family. The prosecutor's questions on redirect examination were relevant to JD3's credibility in accusing defendant of molestation, and the probative value of this evidence was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

Contrary to defendant's contention, JD3's testimony on redirect examination, which was brief and did not include any details about J.C.'s molestation, did not uniquely tend to evoke an emotional response or bias against defendant. The evidence elicited was not of such a nature as to inflame the emotions of the jury that they would use the information for an improper purpose, including to conclude that defendant was guilty of molesting JD3 because JD3 accused defendant's identical twin brother of molesting him. Indeed, in our view the admission of this evidence was more likely to cause the jury to

33

question JD3's credibility in accusing *both* his father and uncle of molesting him and suspect he was merely lashing out at multiple family members with false allegations. We are similarly unpersuaded by defendant's contention that the challenged testimony should not have been admitted because it had little or no relevance to any contested issue at trial. The credibility of the John Does was the critical issue at trial. On redirect examination, the prosecutor sought to challenge the inference that JD3 had a motive to falsely accuse defendant of molesting him because of his animosity toward his family, including his professed hatred of his parents. Thus, the evidence was at least minimally helpful in assisting the jury in determining whether defendant was guilty of molesting JD3.

In any event, any error was harmless. The outcome of this case hinged on whether the jury believed the John Does. The jury was given adequate opportunity to evaluate JD3's credibility and ultimately decided to credit his claim that defendant molested him. The prosecutor did not mention JD3's claim of molestation against J.C. in closing argument. Instead, the prosecutor urged the jury to believe the John Does and reject the defense's fabrication theory. In doing so, the prosecutor highlighted the fact that the molestation of all three John Does was primarily accomplished in the same way; namely, defendant would initiate the abuse while the John Does were asleep and vulnerable. And the jury was specifically instructed not to not consider any evidence about J.C. to show that defendant committed any of the crimes charged in this case. We presume the jury understood and followed this instruction. (*People v. Chism* (2014) 58 Cal.4th 1266, 1299 (*Chism*); *People v. McKinnon* (2011) 52 Cal.4th 610, 670 (*McKinnon*).) On this record, we do not find it reasonably probable that defendant would have obtained a more favorable result had the trial court prevented JD3 from explaining on redirect examination why he hated his parents. (*People v. Partida, supra*, 37 Cal.4th at p. 439 [absent fundamental unfairness, state law error in admitting evidence subject to the reasonably probable standard articulated in *Watson*].)

34

III

*Prosecutorial Misconduct*

Defendant contends the prosecutor committed prejudicial misconduct while questioning defense expert William O'Donohue, Ph.D. He argues reversal is required because the prosecutor asked argumentative questions to insinuate that (1) Dr. O'Donohue betrayed his clients (i.e., child sexual abuse victims) by sharing the information he learned during their counseling sessions with defense attorneys, and (2) defense attorneys who represent clients accused of child molestation work to subvert justice by helping abusers escape justice.

A. *Additional Background*

It is well-settled that "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301, fn. omitted,) Thus, in California, "it has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, [testimony regarding] CSAAS [Child Sexual Abuse Accommodation Syndrome] is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (*In re S.C.* (2006) 138 Cal.App.4th 396, 418.)

At trial, a professor at U.C. Davis and a clinical psychologist at U.C. Davis Children's Hospital testified as a prosecution expert on the subject of child sexual abuse, including CSAAS. Because the admissibility of the CSAAS evidence is not challenged

on appeal, we do not provide a detailed account of this testimony. We simply note that this testimony was particularly relevant in this case to explain the John Does' delay in disclosure, JD1's and JD2's incremental disclosure, JD1's and JD2's inconsistencies and contradictions regarding the molestation, and JD1's and JD2's various recantations of their allegations of molestation at trial.

Dr. O'Donohue testified as an expert for the defense on the subject of child sexual abuse. At the time of trial, he was a licensed psychologist, professor at the University of Nevada, Reno, and director of the Victims of Crime Treatment Center for Sexual Abuse Victims operated by the university. On direct examination, Dr. O'Donohue was asked questions concerning, among other things, JD1's and JD2's pretrial interviews, CSAAS, and suggestibility (i.e., suggested memories) in the context of forensic interviews of children who have allegedly been sexually abused. During his testimony, Dr. O'Donohue noted that most child sexual abuse victims are consistent as to the "core details" of the abuse, it is rare for a sibling to witness the sexual abuse of another sibling, and that it is "expected" that "individuals who witness each other's events" (i.e., molestation) would consistently recount "core details" of the molestation. Dr. O'Donohue also noted that leading, suggestive, and repeated questions can result in children forming false memories, that suggested memories are often "told more inconsistently'" and that younger children are "more prone to suggestibility."

When asked about the "forensic side" of his practice, Dr. O'Donohue explained: "Lawyers call me up to consult on cases, mainly defense attorneys. And they send me materials, and then I review the materials and give opinions about issues, like the quality of the forensic interview, problems with that, unusual aspects of the allegation." Near the end of direct examination, Dr. O'Donohue noted that he had been practicing for 32 years, and that he "mostly" testifies as a defense witness in criminal trials.

On cross-examination, the prosecutor attempted to establish bias on the part of Dr. O'Donohue. As relevant here, the prosecutor and Dr. O'Donohue engaged in the following exchange:

"Q. But as a therapist, you're listening to victims of child maltreatment, physical abuse, and in this particular realm, sexual abuse, correct?

"A. Yes.

"Q. You're listening to their tragedies?

"A. Yes.

"Q. You're listening to their victimization?

"A. Correct.

"Q. And you receive money in part by giving therapy and counseling to these survivors of sexual assault?

"A. Yes.

"Q. And you then have interpreted your work with people and have done things such as published books, correct?

"A. Correct.

"Q. So you've made money off of that too?

"A. Yes. And you don't make much money publishing academic books, but it's some.

"Q. And you've given presentations on your work that you have done with patients studying their victimization, studying their tragedies and applying that to literature, correct?

"A. Yes. I've given presentations to police officers and to Defense attorneys.

"Q. When was the last time you gave a presentation to the police department? Because my understanding, your last invitation was rescinded.

"A. The last invitation was rescinded after a DA talked to them. But the last time before that was probably about six or seven years ago, and I was invited by the director of the child abuse center in Reno, Dr. Kristin MacLeod.

"Q. You have no affiliation with her, do you?

"A. No.

"Q. So - - but that's not primarily your target audience, is it? You're a Defense expert. You primarily testify for the Defense?

"A. Well, I'm not a Defense expert. I do primarily testify for the Defense. I would testify for the Prosecution, but you control that. I can't come in here and testify if you don't ask me first.

"[PROSECUTOR]: May I have this marked?

"THE COURT: Yes.

"[DEFENSE COUNSEL]: May we approach?"

After a brief sidebar discussion, the exhibit--a presentation given by Dr. O'Donohue--was marked for identification and the following exchange then occurred:

"Q. Dr. O'Donohue, so we talked about your work with victims for 22 years in the area of sexual assault and your experiences with them and the fact that you present in this area, correct?

"A. Correct.

"Q. And I have a feeling you know what I'm going to hand you. In 2009, you testified, taking all the information you've gleaned from child sexual assault victims, and you presented at the annual fall criminal defense seminar titled Winning Strategies from Defense Experts and you specifically talked about forensic interviews?

"A. Yes, I was asked by an attorney to give a talk at a conference about forensic interviews with children, and I did that.

"Q. And that interview was Mr. Rothschild, correct?

"A. Michael Rothschild. Not the interview but the lawyer who asked me, yes.

38

"Q. And he is predominantly known in the Sacramento area for being a Defense attorney for child molestation cases, correct?

"A. I believe that's true.

"Q. So as part of the winning strategies from the expert, you presented on the topic of child forensic interviewing?

"A. Yes. I didn't know what the title of the conference was, but--

"Q. But you knew your audience.

"A. Yeah, I don't think it's any problem to give education to Defense attorneys or to DAs. It's part of a role of a professor . . . to provide, give lectures and to give information to people who ask.

"Q. Do your clients know -- and by 'your clients' I'm talking about the ones where you've listened to their tragedies, you've listened to their victimization -- that you've summarized their experiences and then you handed that information to the people who would help their abuser escape justice? Do your clients know that, sir?

"A. There's a lot of problems with that. One is what I'm --

"Q. Yes or no, sir. Do your clients --

"THE COURT: Wait a minute.

"[DEFENSE COUNSEL]: Objection. Argumentative.

"THE COURT: Sustained.

"Restate your question.

"[PROSECUTOR]:

"Q. Do your clients know specifically that you have gone and taken their tragedies and victimizations and taught people who represent them in court how to avoid being convicted?

"A. Well, I haven't done that, so it's impossible for them to know that."

B. *Applicable Legal Principles*

" ' "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' " ' [Citations.] ' "Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." ' [Citations.] . . . Prosecutorial misconduct can result in reversal under state law if there was a 'reasonable likelihood of a more favorable verdict in the absence of the challenged conduct' and under federal law if the misconduct was not 'harmless beyond a reasonable doubt.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 333-334.)

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 259; see also *People v. Tully* (2012) 54 Cal.4th 952, 1010.) " 'The primary purpose of the requirement that a defendant object at trial . . . is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.) The general forfeiture rule is subject to two exceptions. A claim of prosecutorial misconduct is reviewable on appeal, absent an objection and request for an admonition, if (1) an objection would have been futile (*People v. Hill* (1998) 17 Cal.4th 800, 820), or an admonition would not have cured the harm (*People v. Friend* (2009) 47 Cal.4th 1, 29).

C. *Analysis*

Defendant contends the prosecutor engaged in misconduct by asking Dr. O'Donohue a second argumentative question after the trial court sustained a defense objection on the ground of argumentative questioning.

While effective and legitimate cross-examination may include assertive and even harsh questioning, it may not be argumentative. (*People v. Armstrong* (2019) 6 Cal.5th 735, 796 & fn. 23; *People v. Chatman* (2006) 38 Cal.4th 344, 384.) An argumentative question is one that is designed to engage a witness in argument rather than elicit facts within the witness's knowledge. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1125, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) "An argumentative question is a speech to the jury masquerading as a question. . . . . An argumentative question that essentially talks past the witness, and makes an argument to the jury, is improper because it does not seek to elicit relevant, competent testimony, or often any testimony at all." (*Chatman*, at p. 384.)

We agree the challenged questions were argumentative. However, asking the questions was not necessarily prejudicial misconduct.

As an initial matter, we conclude that defendant has forfeited his prosecutorial misconduct claim. He never raised the issue of misconduct or asked the trial court to admonish the jury to disregard any impropriety on the part of the prosecutor. We are unpersuaded by defendant's contention that an objection on the ground of misconduct would have been futile or that an admonition would not have cured any harm from the challenged questions. Indeed, the trial court had already sustained the one and only objection made by defense counsel during the exchange set forth above.

But even were we to overlook forfeiture and assume the challenged questions amounted to misconduct, they do not constitute prejudicial misconduct. The trial court sustained defendant's objection to the first question, dispelling any prejudice as to that question. (*People v. Fuiava* (2012) 53 Cal.4th 622, 687.) In response to the prosecutor's second question, Dr. O'Donohue denied that he had done the things the argumentative question accused him of doing. The prosecutor did not ask any further questions about this topic. And the trial court instructed the jury to ignore any of the attorneys' questions to which it had sustained an objection. (See CALCRIM No. 104.) We presume the jury

41

understood and followed this instruction.  (*Chism, supra*, 58 Cal.4th at p. 1299; *McKinnon, supra*, 52 Cal.4th at p. 670.)  On this record, including the evidence supporting the guilty verdicts, we are convinced that reversal is not required.

IV

*Alleged Instructional Errors*

Defendant makes a number of instructional error claims, which we next address in turn.  As we shall explain, we reject these claims, which we address on the merits.  We need not and do not consider the Attorney General's forfeiture arguments.

A.  *Generally Applicable Legal Principles and Standard of Review*

" 'The trial court has the duty to instruct [the jury] on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." ' "  (*People v. Alexander* (2010) 49 Cal.4th 846, 920-921.)

The claims of instructional error raised by defendant are subject to the independent or de novo standard or review.  (See *People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1411.)  " 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.' "  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 905.)  A reviewing court reads the instructions as a whole to determine whether there is a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.  (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)  We presume the jurors understood, correlated, and correctly applied the instructions.  (*People v. Carey* (2007) 41 Cal.4th 109, 130.)  In assessing the probable

42

impact of the instructions on the jury, we consider the arguments of trial counsel. (*People v. Young, supra*, 34 Cal.4th at p. 1202.)

B. *CALCRIM No. 105*

Defendant contends the trial court prejudicially erred in instructing the jury with the optional portion of CALCRIM No. 105, which states that a witness's character for truthfulness can be inferred from the lack of discussion on the topic among the people who know him or her. He argues that reversal is required because there was no evidence to support this instruction, which invited the jury to irrationally infer that JD1 had a character for truthfulness. The Attorney General concedes the error, but argues it was harmless. We agree with the Attorney General.

" 'What people say behind your back is your standing in the community in which you live.' On the other hand, what people do *not* say about you may also shed light on your reputation in the community and, in turn, your character. That is the principle behind an optional part of CALCRIM No. 105—the standard instruction on witness credibility—which informs the jury that '[i]f the evidence establishes that a witness's character for truthfulness has not been discussed among the people who know him or her, you may conclude from the lack of discussion that the witness's character for truthfulness is good.' " (*People v. Jimenez* (2016) 246 Cal.App.4th 726, 728, fns. omitted.)

" ' " 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference.' " ' [Citation.] Consistent with this rule, the Bench Note to CALCRIM No. 105 advises the court concerning the optional instruction as follows: 'Give any of the final three bracketed paragraphs *if relevant based on the evidence*.' " (*People v. Jimenez, supra*, 246 Cal.App.4th at pp. 732-733.)

We agree with the parties that the trial court erred by instructing the jury with the optional portion of CALCRIM No. 105, as there was no evidence to support the inference suggested by this instruction. However, we find the error harmless. In our view, it is not

reasonably probable the jury applied the instruction in an impermissible manner and would have returned a more favorable verdict had the instruction not been given. (*People v. Cross* (2008) 45 Cal.4th 58, 67 ["giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal" ' "]; *People v. Lee* (1990) 219 Cal.App.3d 829, 841 ["Where, as here, the court gives a legally correct, but irrelevant, instruction, the error 'is usually harmless, having little or no effect "other than to add to the bulk of the charge" ' "]; see also *People v. Guiton* (1993) 4 Cal.4th 1116, 1130 [error in giving legally correct but inapplicable instruction is "one of state law subject to the traditional *Watson* test"].) The jury was specifically instructed that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case." (CALCRIM No. 200.) We presume the jury understood and followed this instruction and ignored the inapplicable instruction. (*Chism, supra*, 58 Cal.4th at p. 1299; *McKinnon, supra*, 52 Cal.4th at p. 670.) We additionally note that neither party mentioned the instruction in closing argument; at no point did the prosecutor argue or suggest that there was evidence establishing JD1's or any other witness's character for truthfulness. Further, the jury was well aware from the evidence presented at trial and defense counsel's closing argument that there was evidence, including JD1's conflicting testimony, supporting the conclusion that JD1 had been untruthful at times. Under these circumstances, we are convinced that defendant suffered no prejudice from the instructional error.

C. *CALCRIM No. 1191B*

Prior to deliberations, the jury was instructed pursuant to a modified version of CALCRIM No. 1191B that evidence of a *charged* sex offense, if proven beyond a reasonable doubt, was admissible to prove defendant was disposed or inclined to commit the other charged sex offenses, but that such evidence alone was insufficient to prove defendant was guilty of another crime; the People must still prove each charge beyond a reasonable doubt.

On appeal, defendant contends the trial court prejudicially erred in providing the jury with this instruction. He argues this instruction includes an irrational permissive inference, which invited the jury to infer that if he was guilty of one charged offense, it was likely he committed all of the charged offenses. This claim is foreclosed by *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*).

In *Villatoro*, our Supreme Court held that Evidence Code section 1108 permits the jury to draw a propensity inference from currently charged sex offenses, and approved a modified version of CALCRIM No. 1191, similar to the instruction given in this case. (*Villatoro, supra*, 54 Cal.4th at pp. 1164, 1167-1168.) The modified instruction used in *Villatoro* explained to the jury that "if it decided that defendant had committed a charged sex offense, 'from that evidence' it could conclude that defendant had a disposition to commit the other charged sex offenses, and that based on that decision, the jury could also conclude that defendant was likely to and did commit the other charged sex offenses." (*Id*. at pp. 1165, 1167.) After *Villatoro* was decided, CALCRIM No. 1191 was modified to distinguish uncharged sex offenses from charged sex offenses as propensity evidence, and now includes language similar to the instruction given in the *Villatoro* trial. (See *Villatoro*, at p. 1167; CALCRIM No. 1191A; CALCRIM No. 1191B.)[11] The *Villatoro* court held that the instruction properly implemented Evidence Code section 1108 and did not impermissibly lower the standard of proof or otherwise interfere with the presumption of innocence. (*Villatoro*, at pp. 1164-1165, 1168.)

In view of *Villatoro*, which we must follow, the trial court did not err in instructing the jury pursuant to CALCRIM No. 1191B. (See *People v. Meneses* (2019)

---

[11] In 2017, the Judicial Council revised CALCRIM No. 1191 and split it into two instructions to distinguish between uncharged offenses offered as propensity evidence (CALCRIM No. 1191A) and charged offenses offered for that purpose (CALCRIM No. 1191B). (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 496, fn. 1.)

45

41 Cal.App.5th 63, 68; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

We reject defendant's contention that the permissive inference in CALCRIM No. 1191B should not apply where, as here, the "other charged offenses" include an element that must be proved in addition to the proscribed sexual act (e.g., force element). While it is true, as defendant argues, that a person's disposition or inclination to commit sex offenses is of no assistance to the jury's determination as to whether an additional required element has been proven (e.g., whether force was used), CALCRIM No. 1191B specifically instructs the jurors that if they find that the defendant committed one or more of the charged crimes, that conclusion is not sufficient by itself to prove defendant was guilty of another crime; the People must still prove each charge beyond a reasonable doubt. (See CALCRIM No. 1191B.)

D. *Limiting Instruction*

Next, defendant contends the trial court gave the jury an erroneous limiting instruction regarding the evidence adduced at trial concerning JD3's father, J.C. The challenged instruction advised the jury that the evidence presented at trial about J.C. (including JD3's claim that he was molested by J.C.) could only be considered for the limited purpose of evaluating the bias, interest, motives, and credibility of JD3 (and others), and that the evidence could not be considered for any other purpose, including to show that defendant committed any of the charged crimes.

Defendant initially argues that reversal is required because the limiting instruction did not advise the jury that JD3's allegation of molestation against J.C. could not be considered for the truth of the matter asserted, which permitted the jury to conclude that JD3's credibility in accusing defendant of molesting him was bolstered by the fact that defendant's identical twin (J.C.) committed a similar offense on a different occasion. According to defendant, the jurors were allowed to treat JD3's accusation of molestation

46

against J.C. as true and infer that defendant had a genetic propensity to commit the charged offenses because J.C. was guilty of molesting JD3. We reject this claim.

"We 'credit jurors with intelligence and common sense' [citation] and presume they generally understand and follow instructions." (*McKinnon, supra*, 52 Cal.4th at p. 670; see *People v. Guerra, supra*, 37 Cal.4th at p. 1115 [we presume jurors follow limiting instructions].) We find it highly unlikely the jury misinterpreted and misapplied the limiting instruction in the manner defendant suggests. The challenged instruction specifically told the jury that the evidence concerning J.C. could *not* be used to show that defendant was guilty of the charged crimes. The jury was advised that the evidence as to J.C. was *only* to be considered in evaluating the bias, interests, motives, and credibility of JD3, among others.

To the extent defendant complains that the limiting instruction improperly permitted the jury to use the evidence concerning J.C. to evaluate the bias, interests, motives, and credibility of witnesses other than JD3, we discern no basis for reversal. Even assuming the instruction was incorrect in this respect, we fail to see how defendant was prejudiced. As we have repeatedly stated, the outcome of this case hinged on whether the jury believed the John Does. The evidence adduced at trial regarding J.C. was limited; it only consisted of JD3's testimony on redirect examination explaining why he "hated" J.C., which included JD3's claim that J.C. molested him. The testimony spanned one page of the reporter's transcript. It was only relevant to a collateral credibility issue (i.e., JD3's credibility) and had no direct bearing on any contested issue, including whether defendant molested JD3. The prosecutor did not discuss the evidence about J.C. in closing argument, and the jury was specifically instructed that some of the trial court's instructions may not apply. (CALCRIM No. 200.) On this record, we are convinced that any instructional error was harmless.

47

V

*Ineffective Assistance of Counsel*

Defendant raises two claims of ineffective assistance of counsel, with which we disagree, as we next explain.

A.  *Generally Applicable Legal Principles*

" 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1189 (*Carter*).)  " 'Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*In re Avena* (1996) 12 Cal.4th 694, 721.)  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (*Strickland v. Washington* (1984) 466 U.S. 668, 695 (*Strickland*).)

Defendant bears the burden of establishing inadequate assistance of counsel. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217)  "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland, supra*, 466 U.S. at p. 697.)

B.  *Closing Argument Regarding Count Nine--Lewd and Lascivious Act Upon JD3*

Defendant initially contends that his trial counsel was ineffective in closing argument by failing to (1) object or otherwise inform the jury that the prosecutor erroneously stated the age requirement on count nine was satisfied by proof that JD3 was

under 15 years of age at the time of the offense, and (2) argue that the evidence showed JD3 was 14 years old at the time of the offense.

### 1. *Additional Background*

Prior to deliberations, the jury was instructed orally and in writing on the elements of count nine, which charged defendant with committing a lewd and lascivious act upon JD3 when JD3 was under the age of 14 years in violation of section 288, subdivision (a).

While discussing count one in closing argument, the prosecutor told the jurors to "always" rely on the law as given to them by the trial court because she "might misstate something," and to "always" refer to the jury instructions if she "state[d] anything differently." Later, the prosecutor advised the jury that count nine (lewd and lascivious act) involved JD3 and required, among other things, a finding that JD3 was under the age of 14 at the time of the offense. Immediately thereafter, the prosecutor emphasized that the "biggest fight" on this count was going to be whether JD3 was "under the age of 14." After the prosecutor discussed the other elements of the offense, she returned to the age requirement, noting that the "fight" as to this count is "primarily over the age" of JD3. She pointed out that there was evidence that JD3's family moved out of their home in November 2014, that there were some "discrepancies" as to how quickly JD3's family moved in with defendant's family thereafter, and that JD3's mother testified that her family did not have the financial means to live in hotels for a year. The prosecutor then made the following challenged remarks: "So [JD3] originally disclosed that this happened [(i.e., the molestation)] when he was in 6th grade, which would have made him 12 to 13 years old. That's what he said at the time of his interview. And then he testified on the stand he was either 13 or 14 years old. [¶] *So in order for the Defendant to be guilty of this crime, you have to [find] that the Defendant committed the crime before [JD3] turned 15. So that's why it takes you to the day before his birthday. So it's June 6th, 2015, is the last day he is 14. So you would all have to agree that this crime was*

49

*committed sometime between when [his family] moved in [with defendant's family] in 2014 before his 15th birthday.* (Italics added.)

Defense counsel did not object to the prosecutor's references to JD3's 15th birthday.

During defense counsel's closing argument on count nine, he initially focused on the timing of JD3's disclosure of molestation and argued that JD3 was a liar who had a motive to get even with defendant for, among other things, the flyers defendant posted at his school. As for the age requirement, defense counsel noted that JD3's family was evicted from their home in November 2014 and that the family became homeless for a period of time. Defense counsel then stated: "It's either a year or six months or something along those lines before they move into [defendant's home]. And that just gets to the issue that [the prosecutor] was talking about, how old would . . . [JD3 have] been. His date of birth is . . . June of 2001. So you guys can work that out."

2. *Analysis*

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Centeno, supra*, 60 Cal.4th at p. 667.)

We see no prejudice. The record reflects that the testimony adduced at trial and the prosecutor's closing argument as to count nine focused on the age requirement;

50

specifically, whether JD3 was under 14 years of age at the time of the offense. As we have just described, during closing arguments the prosecutor advised the jurors to rely on the court's instructions over her argument and initially explained correctly that a guilty verdict on count nine would require a finding that JD3 was *under the age of 14* and emphasized that was a finding at issue. While the prosecutor erroneously concluded her remarks on this count by telling the jurors that they must decide whether the offense occurred before JD3 turned 15--rather than 14--years old, we cannot conclude that defendant suffered prejudice. (*People v. Carter, supra*, 36 Cal.4th at p. 1189.) As the prosecutor correctly highlighted for the jury, the question was whether the molestation occurred before JD3's birthday in June 2015. We do not agree with defendant's argument that it is reasonably probable that, but for defense counsel's failure to object to the prosecutor's misstatements regarding the age requirement for count nine, the jury would have harbored a reasonable doubt respecting defendant's guilt on that count. (*Strickland, supra*, 466 U.S. at p. 695.) The prosecutor's misstatements about the law were brief and came after she told the jury to follow the law as stated in the instructions even if she said otherwise, and emphasized that count nine required a finding that JD3 was under 14 years old. The jury was instructed orally and in writing that a guilty verdict on count nine required a finding that JD3 was under the age of 14 years when the offense occurred, and that if "the attorneys' comments on the law conflict with the Court's instructions, you must follow the Court's instructions." We presume the jurors understood and followed these instructions. (*Chism, supra*, 58 Cal.4th at p. 1299; *McKinnon, supra*, 52 Cal.4th at p. 670.) Under the circumstances presented, we are convinced that defense counsel's failure to object to the prosecutor's misstatements of law or point out her errors in closing argument did not prejudice defendant.

Equally without merit is defendant's contention that reversal is required because defense counsel failed to highlight the evidence supporting a finding that JD3 was 14 years old at the time of the offense charged in count nine. Because the evidence

51

supporting that finding was relatively weak compared to the evidence supporting a finding that the age requirement was satisfied, we cannot say that it is reasonably probable that, but for defense counsel's alleged deficient performance, the jury would have had a reasonable doubt respecting guilt on count nine. (*Strickland, supra*, 466 U.S. at p. 695.)

### C. *Beyond a Reasonable Doubt Standard*

Next, defendant contends his trial counsel was ineffective for failing to object when the prosecutor mischaracterized the standard of proof in rebuttal closing argument.

#### 1. *Additional Background*

Prior to closing argument, the trial court orally instructed the jury pursuant to CALCRIM No. 220. The jury was told that defendant was presumed innocent and that this presumption required the prosecution to prove defendant was guilty of the charges beyond a reasonable doubt. The court gave the jury the standard definition of reasonable doubt: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt."

At the outset of his closing argument, defense counsel reminded the jury of the presumption of innocence and that the prosecution had the burden to prove the charges beyond a reasonable doubt. Defense counsel also read the standard definition of reasonable doubt as set forth in CALCRIM No. 220.

In rebuttal closing argument, the prosecutor urged the jury to refer to the instruction on reasonable doubt and then read the standard definition of reasonable doubt as set forth in CALCRIM No. 220. Immediately thereafter, the prosecutor concluded her remarks to the jury by stating as follows: "The law takes into account that we are human. How many times have we gone to dinner with our family, family events and maybe even the next day, the next week, the next month, you sit there and say, Did I hear that right? Did I see that right? Because we are normal thinking human beings, and those are our

52

own ways.  [¶]  So, ladies and gentlemen, an abiding conviction of the truth of the charge simply boils down to this:  *You believe the charges against the Defendant are true and that the People have met their burden of proof, and if you do, find the Defendant guilty*.  [¶]  Thank you."  (Italics added.)

### 2. *Applicable Legal Principles*

"Under the due process clauses of the Fifth and Fourteenth Amendments, the prosecution must prove a defendant's guilt of a criminal offense beyond a reasonable doubt, and a trial court must so inform the jury."  (*People v. Aranda* (2012) 55 Cal.4th 342, 356.)

Proof beyond a reasonable doubt requires "a subjective state of near certitude" about the accused's guilt.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 315.)  California law defines reasonable doubt as follows:  " 'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' "  (§ 1096.)

CALCRIM No. 220 describes proof beyond a reasonable doubt as "proof that leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt."  In *People v. Zepeda* (2008) 167 Cal.App.4th 25, a panel of this court explained that "[t]he modifier 'abiding' informs the juror his conviction of guilt must be more than a strong and convincing belief.  Use of the term 'abiding' tells the juror his conviction must be of a 'lasting, permanent nature,' it informs him 'as to how strongly and *deeply* his conviction must be *held*.' "  (*Id*. at pp. 30-31 [finding the "phrase, 'proof that leaves *you* with an abiding conviction that the charge is true,' unmistakably conveys the conviction's subjective nature and the very high level of certainty required"].)

"The United States Supreme Court and the California Supreme Court, respectively, have described 'an abiding conviction' as one that is 'settled and fixed' [citation] and one that is 'lasting [and] permanent' [citation]." (*People v. Pierce* (2009) 172 Cal.App.4th 567, 573.)

### 3. *Analysis*

We conclude that defendant's trial counsel was not ineffective. The prosecutor did not mischaracterize the reasonable doubt standard or otherwise misstate the law in rebuttal closing argument as to the burden of proof. Instead, the prosecutor correctly defined the reasonable doubt standard and urged the jury to find defendant guilty if it believed the charges were true *and* the prosecution met its burden of proof, that is, proved the charges beyond a reasonable doubt, which requires the jurors to have an abiding conviction that the charges are true. (CALCRIM No. 220.) Because there was no misstatement of the law warranting a defense objection, defense counsel's performance was not deficient. (*People v. Lucero* (2000) 23 Cal.4th 692, 732.)

Defendant's reliance on *Centeno*, a case involving child sexual abuse, is misplaced. In *Centeno*, the prosecutor misled the jury on the burden of proof in two ways, only the second of which is arguably relevant here. (*Centeno, supra*, 60 Cal.4th at pp. 665-666, 669-673.) As for the second way, the prosecutor in *Centeno* told the jury that its decision had to be based on reason and that it needed to "look at the entire picture" to determine if the case had been proved beyond a reasonable doubt. (*Id.* at p. 671.) The prosecutor asked whether it was reasonable to believe that the child victim lied or that defendant abused her, and the prosecutor repeatedly indicated it was reasonable to believe defendant abused the child. (*Id*. at pp. 671-672.) The *Centeno* court concluded that many portions of the prosecutor's argument were unobjectionable, but ultimately reversed after finding that the argument "strongly implied that the People's burden was met if its theory was 'reasonable' in light of the facts supporting it." (*Id.* at pp. 671-672, 678.) Here, in contrast to *Centeno*, the prosecutor did not imply, much less

54

"strongly" imply, that the jury should convict defendant if it was more reasonable to believe him guilty than not. Nor did the prosecutor suggest the jury could find defendant guilty based on a " 'reasonable' account of the evidence." (*Id*. at p. 673.) Moreover, the facts of this case are nothing like *Centeno*. In our view, the present case, unlike *Centeno*, cannot accurately be characterized as a "very close case." (See *id*. at p. 677 [explaining why the case was very close].)

## VI

### *Alleged Sentencing Errors*

Defendant makes several claims of sentencing error; as we shall explain, we find merit in one of these claims. We will modify the judgment to correct the error.

A. *Failure to Stay Sentence on Count Three--Lewd and Lascivious Act Upon JD1*

Defendant was convicted of committing three sex offenses against JD1: sodomy (count one), oral copulation (count two), and lewd and lascivious act (count three). On appeal, defendant contends the imposition of sentence on count three violated section 654's proscription against multiple punishment. He argues count three was based on the same conduct as counts one and two, and the trial court's failure to stay sentence on count three violated his constitutional rights under the due process and double jeopardy clauses of the United States Constitution. He adds that principles of estoppel barred the prosecution from arguing at sentencing that count three should not be stayed under section 654. Finally, he argues that there is no evidence in the record to support a separate sentence on count three. We reject these arguments.

1. *Additional Background*

At the preliminary hearing, a detective who watched and listened to JD1's forensic interview testified about two incidents of oral copulation and two incidents of sodomy involving defendant and JD1 during the 2017 Thanksgiving holiday. Thereafter, the parties stipulated to the admission of JD1's entire forensic interview for the trial court's review and consideration.

55

In requesting a holding order for the counts involving JD1, the prosecutor told the trial court that her intent was that count three (lewd and lascivious act) was "section 654" to counts one (sodomy) and two (oral copulation). When asked by the trial court, the prosecutor acknowledged that she was "conceding" that count three was "654" as to counts one and two. Shortly thereafter, the court noted that section 654 issues do not impact the preliminary hearing (i.e., whether a holding order should be issued as to particular counts), as the application of section 654 is a sentencing issue. At the conclusion of the preliminary hearing, the court held defendant to answer on all counts. As to the counts involving JD1, the court found credible the statements he made in his forensic interview describing defendant's molestation.

In her opening statement, the prosecutor told the jury that the evidence would show that defendant orally copulated JD1 once and sodomized him twice during the 2017 Thanksgiving day holiday. The prosecutor did not state that the acts giving rise to counts one (sodomy) and two (oral copulation) provided the factual basis for count three (lewd and lascivious act).

As detailed *ante*, there was evidence presented at trial supporting counts one and two, as well as additional evidence supporting count three; specifically, evidence supporting the conclusion that defendant committed a separate and additional lewd and lascivious act upon JD1 during the 2017 Thanksgiving holiday.

Prior to closing argument, the trial court orally instructed the jury on the unanimity requirement pursuant to the modified unanimity instruction, CALCRIM No. 3501, which is required when, as here, there are multiple acts that could support a single charge. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132; *People v. Fernandez* (2013) 216 Cal.App.4th 540, 555-556 (*Fernandez*).) The jury was instructed that the prosecution had presented evidence of more than one act to prove defendant committed count three (lewd and lascivious act), and that the jury could not find defendant guilty unless they unanimously agreed either that (1) the prosecution had proved that defendant

56

"committed at least one of these acts and you all agree on which act he committed for each offense," or (2) the prosecution had proved that defendant "committed all the alleged acts to have occurred during this time period" (i.e., the 2017 Thanksgiving holiday) and had also proved that defendant "committed at least [the] number of offenses charged." (See CALCRIM No. 3501.)

The jury was also instructed with a modified version of CALCRIM No. 3502, which is required when, as here, the prosecution elects a specific factual basis for a charged offense and there is evidence of multiple criminal acts. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534-1536.) The instructed stated: "You must not find the [d]efendant guilty of any of the charged counts unless you all agree that the People have proved specifically that the [d]efendant committed the offense connected to each count. [¶] . . . [¶] The [p]rosecution alleges that Count 1 . . . relates to an alleged sodomy, and Count 2 relates to an alleged oral copulation perpetrated by the [d]efendant against [JD1 during the 2017 Thanksgiving holiday]. [¶] The [p]rosecution alleges that Count 3 relates to alleged lewd conduct perpetrated by the [d]efendant against [JD1] during this same time frame."

In closing argument, the prosecutor described the evidence supporting a guilty verdict on counts one (sodomy) and two (oral copulation). In doing so, the prosecutor identified specific instances of molestation reported by JD1 in his forensic interview. Immediately thereafter, the prosecutor explained to the jurors that if they did not find that there was sufficient evidence to support count one because there was no penetration, they could still find defendant guilty on count three because defendant touched JD1's body with the requisite sexual intent. The prosecutor then stated: "So, for example, a failure of proof, let's say on the part of the People for Count 1, would get you potentially to Count 3, you still being able to find him guilty. [¶] If you found him guilty on Count 1, you can still find him guilty on Count 3. If you find him guilty on Count 2, the oral

57

copulation, you could still find him guilty on Count 3. You just have to agree which act qualifies, and you all have to agree beyond a reasonable doubt for Count 3."

After closing arguments, the jury was given a packet of written instructions, which included the unanimity instructions described *ante*. The jury was also given verdict forms for each count; the verdict form for count three did not identify a specific act that provided the factual basis for that count. The jury returned guilty verdicts on all counts.

At sentencing, defense counsel argued that sentence should be stayed on count three under section 654. In support of his position, defense counsel asserted that the lewd and lascivious act supporting count three was the conduct alleged in count one and count two. The prosecutor disagreed that a stay of sentence was warranted on count three, explaining that while the jurors could of have found defendant guilty on that count if there was "a failure of proof" as to count one or two, "they also could have found him guilty for any of the touching of [JD1's] body because . . . it's any part of the child['s] body that is touched with sexual intent," and there was evidence defendant touched JD1's body "independent of penetration or completed oral copulation."

The trial court implicitly denied defendant's request to stay sentence on count three by imposing a consecutive sentence of 15 years to life on that count.

2. *Applicable Legal Principles*

a. *Section 654*

At the time of sentencing, former section 654, subdivision (a) provided that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Stats. 1997, ch. 410, § 1.)[12]

---

[12] Assembly Bill No. 518 (2021-2022 Reg. Sess.), effective January 1, 2022, amended section 654, subdivision (a) to state: "An act or omission that is punishable in different

Section 654 "does not prohibit the imposition of multiple punishment for separate sexual offenses committed during a continuous attack, 'even where closely connected in time.' " (*People v. Hicks* (1993) 6 Cal.4th 784, 788, fn. 4.) However, a defendant cannot be separately punished for a lewd act "under section 288 and another applicable statute for the *same* criminal act." (*People v. Scott* (1994) 9 Cal.4th 331, 344, fn. 6, italics added.) Thus, although a single act may give rise to multiple convictions under different statutes, a single act may not give rise to multiple punishments. (See *People v. Correa* (2012) 54 Cal.4th 331, 336.) "[W]hen a court determines that a conviction falls within the meaning of section 654, it is necessary to impose sentence but to stay the execution of the duplicative sentence." (*People v. Duff* (2010) 50 Cal.4th 787, 796, italics omitted.)

Whether section 654 applies in a given case is a factual question for the trial court, and its findings (explicit or implicit) must be upheld on appeal if there is any substantial evidence to support them. (*People v. Cruz* (2020) 46 Cal.App.5th 715, 737; *People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) In conducting our review, we view the evidence in the light most favorable to the trial court's findings and presume the existence of every fact the trier could reasonably deduce from the evidence. (*Jones*, at p. 1143.)

### b. *Unanimity Requirement*

"In a criminal case, a jury verdict must be unanimous," and "the jury must agree unanimously the defendant is guilty of a *specific* crime." (*People v. Russo, supra*, 25 Cal.4th at p. 1132.) "Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid*.) " 'The prosecution can make an election by "tying each specific count to specific criminal acts elicited from

_____

ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

59

the victims' testimony"—typically in opening statement and/or closing argument. [Citations.] [¶] Under these principles, there is an implicit presumption that the jury will rely on the prosecution's election and, indeed, is bound by it.' " (*People v. Brugman* (2021) 62 Cal.App.5th 608, 627.) "If the prosecution is to communicate an election to the jury, its statement must be made with as much clarity and directness as would a judge in giving instruction. The record must show that by virtue of the prosecutor's statement, the jurors were informed of their duty to render a unanimous decision as to a particular unlawful act." (*People v. Melhado, supra*, 60 Cal.App.4th at p. 1539; see *Brugman*, at p. 629 [direct and clear statement by prosecutor in closing argument qualifies as an effective election].)

CALCRIM No. 3501 is an alternative instruction to the standard unanimity instruction, CALCRIM No. 3500. (*Fernandez, supra*, 216 Cal.App.4th at p. 556.) "CALCRIM No. 3501 affords two different approaches for the jury to reach the required unanimity. The first is the same as that set forth in CALCRIM No. 3500: agreement as to the acts constituting each offense. But unanimity may also be found under CALCRIM No. 3501 if the jury agrees 'that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved the defendant committed at least the number of offenses charged].' " (*Fernandez*, at p. 556.)

"The unanimity rule has been refined in cases involving sexual molestation of children and repeated identical offenses. 'In such cases, although the jury may not be able to readily distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described. [¶] . . . '[E]ven generic testimony describes a repeated series of *specific*, though indistinguishable, acts of molestation. [Citation.] The unanimity instruction assists in focusing the jury's attention on each such act related by the victim and charged by the People. [There is] no constitutional impediment to allowing a jury, so instructed, to find a defendant guilty of more than one indistinguishable act, providing . . . three minimum prerequisites . . . are

satisfied.' [Citation.] Those prerequisites include generic evidence describing (1) the kind of acts committed, (2) the number of acts committed with sufficient certainty to support the alleged counts, and (3) the general time period in which the acts occurred." (*Fernandez, supra*, 216 Cal.App.4th at pp. 556-557.)

### 3. *Analysis*

We see no sentencing error. In arguing that sentence on count three (lewd and lascivious act) should have been stayed under section 654, defendant relies in part on *People v. Siko* (1988) 45 Cal.3d 820 (*Siko*). "*Siko* is . . . authority that where there *is* a basis for identifying the specific factual basis for a verdict, a trial court cannot find otherwise in applying section 654." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1339, italics added.) However, "in the absence of some circumstance 'foreclosing' its sentencing discretion (as in *Siko* . . .), a trial court may base its decision under section 654 on *any* of the facts that are in evidence at trial, without regard to the verdicts." (*McCoy*, at p. 1340.)

The *Siko* court concluded that the trial court erred when it did not stay sentence on a lewd act conviction where "the charging instrument and the verdict both identif[ied] the lewd conduct as consisting of the rape and sodomy rather than any other act. Nor did anything in the prosecutor's closing argument or in the court's instructions suggest any different emphasis." (*Siko, supra*, 45 Cal.3d at p. 826.) In *Siko*, the Attorney General argued on appeal there was evidence of other conduct that could support the lewd act conviction, because the defendant had separately twisted a handkerchief around the victim's neck and undressed her. (*Id*. at p. 825.) But the "claim [was] untenable" because "[t]here [was] no showing that the lewd-conduct count was understood in this fashion at trial" and a "review of the record demonstrate[d] the contrary." (*Id*. at pp. 825-826.)

We find *Siko* to be distinguishable. Here, in contrast to *Siko*, there was no language in the charging document or verdict form that narrowed the court's discretion

on count three.  The charging document did not base the lewd and lascivious act charged in count three on the sodomy or the oral copulation that provided the basis for counts one and two, respectively.  Nor did the prosecutor elect in opening statement to base count three on the acts providing the basis for counts one and two.  Further, neither the prosecutor's closing argument nor the jury instructions suggested that the acts providing the factual basis for counts one and two were the *only* acts that could provide the factual basis for the lewd and lascivious act supporting count three.  And the verdict form for count three did not identify the specific factual basis for that count.  In short, because the prosecutor did not elect to prove count three on the limited basis identified by defendant, and because nothing else in the record reveals on which act the jury relied in finding defendant guilty on count three, there were no circumstances foreclosing the trial court from exercising its discretion to consider all the evidence adduced at trial to make its sentencing decision under section 654.

We find no merit in defendant's contention that there is insufficient evidence to support the trial court's implied finding that his conviction on count three does not fall within the meaning of section 654.  During JD1's forensic interview, he stated that defendant orally copulated and sodomized him more than once during the 2017 Thanksgiving holiday.  In addition, JD2 testified about a separate incident that occurred during the same time period where he saw JD1 "sucking [defendant's] dick" and defendant "sucking [JD1's] dick."  JD2 also saw defendant sodomizing JD1.  Contrary to defendant's suggestion, the trial court's determination as to the applicability of section 654 was not limited to the prosecutor's theory at sentencing that "there was evidence of touching [JD1's] body independent of penetration [i.e., sodomy] or completed oral copulation."  (*People v. Leonard* (2014) 228 Cal.App.4th 465, 500 [trial court not bound by prosecutor's statements during closing argument when making section 654 decisions].)

Equally without merit is defendant's contention that the trial court erred in failing to stay sentence on count three because the prosecution elected to charge count three as duplicative of counts one and two. In making this argument, defendant relies on statements the prosecutor made during the preliminary hearing; specifically, the prosecutor's comment that it was her intent that count three would "654" to counts one and two, and her concession, when asked by the trial court, to the same In defendant's view, these statements constitute a "deliberative prosecutorial charging decision to charge Count 3 as duplicative of Counts 1 and 2, rather than as an additional offense based on any additional lewd touching." However, the charging document was never amended to reflect this understanding, the prosecutor did not make an election in opening statement to base count three solely on acts giving rise to counts one and two, the jury was not instructed that the only acts supporting count three were the specific acts alleged in support of counts one and two, and, as we have discussed, the prosecution did not elect in closing argument to treat count three as solely based on the same conduct that supported counts one and two. Defendant, for his part, has not cited any authority persuading us that reversal is required under the circumstance presented.

Nor has defendant shown that the double jeopardy clause has been violated because he received multiple punishment for the same offense (*People v. Anderson* (2009) 47 Cal.4th 92, 103-104), or that reversal is required under principles of judicial, equitable, or promissory estoppel. Defendant forfeited his estoppel arguments by failing to raise them in the trial court. (*People v. Case, supra*, 5 Cal.5th at p. 44; *In re Campbell, supra*, 11 Cal.App.5th at pp. 756-757.)[13] In any event, we have considered each of the estoppel doctrines relied on by defendant and find that none of them apply.

---

[13] For this same reason, we reject defendant's judicial admission argument, which also fails on the merits. Defendant cites no authority for the argument that a prosecutor can

Finally, we are unpersuaded by defendant's contention that his due process rights were violated because he did not receive effective notice of the prosecutor's claim that count three was an independent offense.  Notice of the specific charges is among the constitutional rights of every accused in a criminal proceeding.  (*People v. Anderson* (2020) 9 Cal.5th 946, 953 [due process requires that a criminal defendant be given fair notice of the charges so he may have a reasonable opportunity to prepare a defense and avoid unfair surprise at trial].)  "Numerous procedures afford criminal defendants the means to obtain notice of the charges against them.  They include, among others, the information, the preliminary examination and pretrial discovery.  [Citation.]  Because of the availability of these procedures, the California Supreme Court has found that 'prosecution of child molestation charges based on generic testimony does not, of itself, result in a denial of a defendant's due process right to fair notice of the charges against him.'  [Citation.]  In cases involving sexual molestation of children, the function of the accusatory pleading is to give notice to the defendant of the nature of the offense charged and whether it occurred within the applicable limitations period.  ' "[A]t a minimum, a defendant must be prepared to defend against all offenses of the kind alleged in the information as are shown by evidence at the preliminary hearing to have occurred within the timeframe pleaded in the information." ' " (*Fernandez, supra*, 216 Cal.App.4th at pp. 554-555; see *People v. Jeff* (1988) 204 Cal.App.3d 309, 342 [while the information tells the defendant what kinds of offenses he is charged with, the time, place, and circumstances of the charged offenses are left to the preliminary hearing transcript, which is "the touchstone of due process notice to a defendant"].)

As we have discussed, in addition to the detective's testimony at the preliminary hearing describing the basis for the counts involving JD1, the parties stipulated that JD1's

---

make a judicial admission at the preliminary hearing that is binding on the trial court at sentencing with respect to the application of section 654.

entire forensic interview could be considered as evidence supporting these counts. During his forensic interview, JD1 described conduct on the part of defendant that was sufficient to put defendant on notice that there was a factual basis for count three that was independent of the factual basis supporting counts one and two. Thus, there was no due process violation. (*People v. Jeff, supra*, 204 Cal.App.3d at p. 342 ["So long as the evidence presented at the preliminary hearing supports the number of offenses charged against defendant and covers the timeframe(s) charged in the information, a defendant has all the notice the Constitution requires"].)[14]

B. *Sentence on Count Eight--Attempted Oral Copulation of JD2*

Next, defendant contends that his conviction on count eight (attempted oral copulation of JD2) must be reversed because it was based on the same act as count six (oral copulation of JD2). In the alternative, he argues that his sentence on count eight must be stayed under section 654. We disagree.

1. *Additional Background*

Defendant was charged in count five with oral copulation of an unconscious person (JD2) (former § 288a, subd. (f) [now § 287, subd. (f)]), in count six with oral copulation of a person under 16 years of age (JD2) when he was over 21 years of age (former § 288a, subd. (b)(2) [now § 287, subd. (b)(2)]), and in count eight with attempted oral copulation of a person under 16 years of age (JD2) when he was 21 years of age (§ 664; former § 288a, subd. (b)(2) [now § 287, subd. (b)(2)]). The record reflects that the factual basis for counts five and six was the incident where defendant pulled JD2's pants down using his fingernails while JD2 was asleep. At trial, JD2 testified about numerous instances of molestation that occurred at defendant's home in Grass Valley,

---

[14] In light of our determination that defendant's due process claim fails on the merits, we need not and do not consider the Attorney General's forfeiture argument.

including the incident we just described and an additional separate incident where defendant "tried to pull [his] pants down and tried to suck [his] dick and stuff like that."

Prior to deliberations, the jury was instructed with a modified version of the unanimity instruction set forth in CALCRIM No. 3502, which stated: "You must not find the defendant guilty of any of the charged counts unless you all agree that the People have proved specifically that the defendant committed the offense connected to each count. [¶] . . . [¶] The prosecution alleges that Counts 4 to 8 relate to crimes allegedly perpetrated by the defendant against [JD2], between November 26, 2017 and April 19, 2018 at . . . Grass Valley, Nevada County, California. Count 4 alleges an act of forced oral copulation; *Count 5 alleges an act of oral copulation while* [*JD2*] *was unconscious; Count 6 alleges an act of oral copulation against* [*JD2*]*, a person under 16 based upon the same circumstances as Count 5*; Count 7 alleges an attempted sodomy against [JD2]; *Count 8 alleges a separate act of attempted oral copulation against* [*JD2*]." (Italics added.)

During closing argument, the prosecutor erroneously told the jury that the factual basis for count eight was the incident where defendant "tried to suck [JD2's] dick" after defendant used his "nails" to pull JD2's pants down.

The jury returned guilty verdicts on counts five, six, and eight. The trial court imposed a consecutive sentence of four months on count eight.

2. *Analysis*

We see no basis for reversal. The trial court gave a unanimity instruction as to the counts involving JD2. As relevant here, the jury was specifically instructed that counts five and six were based on the incident where defendant orally copulated JD2 while JD2 was allegedly unconscious, that is, the incident in which defendant used his fingernails to pull JD2's pants down while JD2 was asleep. Notably, both counts five and six, which the jury was told involved the same circumstances, alleged a *completed* act of oral copulation, with count five requiring an additional finding of unconsciousness. As for

66

count eight, the jury was instructed that it involved a *separate* act of *attempted* oral copulation. In finding defendant guilty on counts five and six, the jury necessarily found that he orally copulated JD2 while JD2 was unconscious. As such, the jury's verdict on count eight, contrary to defendant's contention, was not based on the same act giving rise to counts five and six.

We are unpersuaded by defendant's contention that the prosecutor's remarks to the jury constituted a binding election to treat count eight as based on the same circumstances as counts five and six. The jury was given a unanimity instruction expressly stating otherwise. And a prosecutor's statements in closing argument are not evidence and they are not binding on the jury or the court. (*People v. Leonard, supra*, 228 Cal.App.4th at p. 500; see also *People v. Perez* (1992) 2 Cal.4th 1117, 1126 ["It is elementary . . . that the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury."].) Indeed, the jury was specifically instructed that the remarks made by the attorneys in closing argument are not evidence (CALCRIM No. 222), and that it must disregard the attorneys' remarks to the extent they conflict with the jury instructions (CALCRIM No. 200). Defendant cites no authority supporting the conclusion that a prosecutor may make a binding election in closing argument that conflicts with a unanimity instruction given by the trial court.

Because we find no merit in defendant's contention that counts six and eight were based upon the same act, we reject his related argument that sentence should have been stayed on count eight under section 654.[15]

_____

[15] We reject defendant's contention that count eight must be reversed due to insufficient evidence. As we have discussed, JD2 testified about an incident where defendant "tried to pull [his] pants down and tried to suck [his] dick and stuff like that." The testimony of a single witness is sufficient to support a finding of guilt. (*Brown, supra,* 59 Cal.4th at p. 106.) We find unpersuasive defendant's contention that there was no evidence to support count eight because the prosecutor elected, in opening statement, to base that count on specific conduct for which no evidence was presented at trial. At no point in

67

C.  *Sentence on Count Six--Oral Copulation of JD2*

Finally, defendant contends, and the Attorney General concedes, that the trial court erred in imposing and staying a consecutive sentence on count six.  We agree.

As noted above, count five charged defendant with oral copulation of an unconscious person (JD2) (former § 288a, subd. (f) [now § 287, subd. (f)]), and count six charged defendant with oral copulation of a person under 16 years of age (JD2) when he was over 21 years of age (former § 288a, subd. (b)(2) [now § 287, subd. (b)(2)]).  It undisputed that these counts were predicated on the same factual basis and the jury was so instructed.  At sentencing, the trial court selected count five as the base term for the determinate term of defendant's sentence and imposed an upper term sentence of eight years.  The trial court then imposed an upper term three-year consecutive sentence on count six but stayed sentence under section 654.

"A sentence cannot be imposed so as to simultaneously run consecutively to another count and be stayed pursuant to . . . section 654; these are mutually exclusive options.  While it is proper for a court to pronounce judgment in terms of 'imposing a term' and 'staying punishment,' it is incorrect to indicate . . . that the sentence . . . runs 'consecutive,' as well.' "  (*People v. Toure* (2015) 232 Cal.App.4th 1096, 1107; see also *People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164.)

We exercise our inherent authority to correct an unauthorized sentence (*People v. Smith* (2001) 24 Cal.4th 849, 852; *People v. Turner* (2002) 96 Cal.App.4th 1409, 1415-1416) by modifying the judgment to reflect that the three-year upper term sentence imposed on count six is stayed pursuant to section 654 and the sentence does not run

opening statement did the prosecutor identify the specific factual basis for count eight. Rather, the prosecutor discussed what she believed the evidence would show at trial, without mentioning any specific count and the conduct that formed the factual basis for that count.

consecutive to the sentence imposed on count five.  Since the abstract of judgment already reflects the correct sentence as to count six, it need not be modified.

## DISPOSITION

The judgment is modified to reflect that the three-year upper term sentence imposed on count six is stayed pursuant to section 654 and the sentence does not run consecutive to the sentence imposed on count five.  As modified, the judgment is affirmed.



<u>    /s/               </u>
Duarte, J.



We concur:



<u>    /s/           </u>
Hull, Acting P. J.



<u>    /s/         </u>
Renner, J.